[Cite as *In re E.B.*, 2017-Ohio-2672.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| E.B., | : | No. 16AP-352 |
| | | (C.P.C. No. 16JU-817) |
| (K.B., | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |
| In the Matter of: | : | |
| E.B., | : | No. 16AP-395 |
| | | (C.P.C. No. 16JU-817) |
| (G.B., | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |
| In the Matter of: | : | |
| A.B., | : | No. 16AP-443 |
| | | (C.P.C. No. 15JU-357) |
| (G.B., | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |
| In the Matter of: | : | |
| J.B., | : | No. 16AP-448 |
| | | (C.P.C. No. 15JU-355) |
| (G.B., | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |

# D E C I S I O N

Rendered on May 4, 2017

**On brief:** *The Law Offices of Bradley Jeckering, LLC,* and *Joel Sprout,* for appellant K.B.

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant G.B.    **Argued:** *George M. Schumann*.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services. **Argued:** *Robert J. McClaren*.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

SADLER, J.

{¶ 1}   Appellants, K.B. and G.B., appeal from judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, awarding permanent custody of their two sons, A.B. and J.B., and their daughter, E.B., to appellee, Franklin County Children Services ("FCCS").  For the reasons that follow, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}   Appellant K.B. and her husband, G.B., are the biological parents of A.B., born March 17, 2007, J.B., born October 18, 2008, and E.B., born August 30, 2015.  At the time of the custody hearing on April 13, 2016, G.B. was in the custody of the Department of Rehabilitation and Corrections, Lancaster Correctional Complex ("LCC"), serving a prison sentence for convictions of forgery and tampering with evidence. K.B.'s parents have custody of the couple's eldest child, L.B. and, according to K.B., her two other biological children, B.D. and J.J., have been living with their maternal grandparents since they were babies.  G.B. testified that he has a 23-year old daughter who lives in California.

{¶ 3}   Both G.B. and K.B. appeared and gave testimony at the permanent custody trial held on April 13-14, 2016.   The juvenile court also heard testimony from the children's court-appointed Guardian ad Litem Keith Brewster ("GAL"), caseworker David Phinney, and Lisa Blackford, associate director of Permanent Family Solutions Network ("PFSN"), the managed care agency working with FCCS on this case.   The evidence presented at the 2016 custody trial revealed that FCCS has been involved with the family since 2010.

{¶ 4}   On October 2, 2010, FCCS temporarily removed A.B. and J.B. from their parents' custody after Columbus Division of Police arrested G.B. for domestic violence. According to G.B., just prior to the October 2, 2010 incident, he had moved the two boys

out of their home and into another residence because he "didn't want [K.B.] bringing her drugs over there" and because K.B.'s "drug people * * * shot up the house I owned on Welch Avenue."  (Apr. 13, 2016 Tr. at 55.)  According to G.B., his wife K.B. was using heroin at the time.  When K.B. attempted to force her way into the home where G.B. had taken the boys, G.B. used physical force to push her out the door.  K.B. called the police alleging that G.B. had committed domestic violence.  When police arrived at the home, G.B. refused to answer the door.  When a Columbus Division of Police S.W.A.T. team subsequently arrived at the scene, G.B. surrendered to police and was taken to jail.

{¶ 5}  Due to G.B.'s incarceration and K.B.'s drug addiction, FCCS obtained temporary custody of A.B. and J.B. on October 8, 2010.  G.B. subsequently pleaded guilty to domestic violence and remained behind bars from October 2, 2010 through December 14, 2011.  FCCS filed a complaint alleging that A.B. and J.B. were dependent children, and on December 6, 2010, the juvenile court adjudged both boys as dependent. FCCS issued a case plan setting forth the conditions K.B. and G.B. had to meet in order to be reunified with their two boys.  The issues addressed in the case plan with respect to K.B. included her alcohol and drug use, her victimization by her husband's domestic violence, her mental health condition of depression, and housing and financial stability. The issues of concern regarding G.B. included his alcohol and drug use, anger management/domestic violence, and occasional jail sentences.

{¶ 6}  On September 24, 2010, FCCS filed its first motion for permanent custody of A.B. and J.B. alleging that neither K.B. nor G.B. had made adequate progress on their case plan and that permanent custody was in the children's best interest.  Following a permanent custody trial, the juvenile court issued a judgment entry denying FCCS' motion for permanent custody.  The September 10, 2014 judgment entry provides, in relevant part, as follows:

> [T]he Court finds that there is not clear and convincing evidence, pursuant to O.R.C. 2151.414(D)(E) that permanent custody is in the best interest of the children.  The Court finds that the children can be placed with the father within a reasonable time or should be placed with their father in the forseeable future. The children's continued residence in or return to the father's home would not be contrary to the children's best interests and welfare.

(Sept. 10, 2014 Permanent Custody Jgmt. Entry at 12.)

{¶ 7}   The juvenile court placed certain preconditions on G.B. regaining legal custody, including "four consecutive weekly urine screens showing negative for any alcohol or other drugs" and "no new domestic violence or other criminal offense charges for which there is a conviction or guilty plea."  (Sept. 10, 2014 Jgmt. Entry at 13.)  The juvenile court also ordered K.B. to meet certain conditions before she could resume visitation with the children, including negative urine screens, completion of substance abuse counseling, and completion of a program for victims of domestic violence.

{¶ 8}   The record shows that FCCS returned physical custody of the two boys to G.B. in mid-September 2014 and that G.B. eventually met the drug and alcohol conditions required by the September 10, 2014 judgment entry.  Accordingly, the juvenile court returned legal custody of the two boys to G.B. on November 4, 2014.  The evidence shows that even though K.B. had not satisfied the conditions for resuming visitation, she moved back into the residence with G.B. and the two boys.

{¶ 9}   K.B. testified that on December 31, 2014, G.B. drank one-half of a bottle of Black Velvet whiskey and then ordered her to go to Kroger and get him another bottle. According to K.B., while she and the children were having fun wrestling with G.B. in the living room, "all of a sudden [G.B.] just got serious with me."  (Apr. 14, 2016 Tr. at 9.) K.B. stated that G.B. "[p]ut his hands around my neck."  (Apr. 14, 2016 Tr. at 10.)  K.B. recalled that A.B. "got hit during the * * * incident" and that he called 911.  (Apr. 14, 2016 Tr. at 11.)  As a result of this incident, G.B. faced charges of domestic violence both as to K.B. and A.B.  Because G.B. was unable to raise bond, he remained in jail.

{¶ 10} On January 13, 2015, FCCS filed a complaint alleging that A.B. and J.B. were abused, neglected, and dependent children.  The matter subsequently proceeded uncontested as to the allegation of dependency.  On January 15, 2015, G.B. pleaded guilty to domestic violence, in violation of R.C. 2919.25(A), a misdemeanor of the first degree, and received a sentence of 180 days in jail, with 16 days of jail-time credit and the remaining 164 days suspended.  The sentencing court also imposed a five-year probationary period, including the condition that G.B. submit to alcohol/drug testing as requested by his probation officer, not possess or consume alcoholic beverages or substances of abuse, attend and successfully complete domestic violence counseling, and

"stay away" and have "no contact" with either K.B. or A.B. during the five-year probationary period.  (Jan. 16, 2015 Conditions of Probation.)

{¶ 11} On June 24, 2015, FCCS filed its second motion for permanent custody of both A.B. and J.B. pursuant to R.C. 2151.414(B) and (D).  Sometime in August 2015, G.B. was arrested in Licking County.  On August 12, 2015, a Licking County Grand Jury indicted G.B. on one count of forgery, a felony of the fifth degree, and one count of tampering with evidence, a felony of the third degree.

{¶ 12} While G.B. was in jail on the Licking County charges, K.B. gave birth to E.B. on August 30, 2015.  There is no dispute that E.B. was born with some very serious medical conditions, including paralyzed vocal chords and Stridor syndrome, which causes a constriction of E.B.'s airway.  As a result, E.B. breathes through a tracheotomy and a breathing tube, which must be cleared every three or four minutes.  E.B. requires constant care including nine hours of overnight nursing care per day to keep her airway clear.  E.B. receives nutrition exclusively through a feeding tube.  In addition, E.B. has a congestive heart defect and a skull that has prematurely closed, restricting the space for her brain to grow.

{¶ 13} On January 22, 2016, when E.B. was just five months old, FCCS filed a motion for permanent custody pursuant to R.C. 2151.353.  The juvenile court granted temporary custody to FCCS on January 25, 2016 and scheduled a trial on the motion for permanent custody to coincide with the trial of the motion for permanent custody of A.B. and J.B.  On February 18, 2016, G.B. pleaded guilty to the Licking County charges, and the court imposed a prison sentence of nine months for forgery and two years for tampering with evidence.  With credit for time served, G.B.'s release date is August 20, 2017.

{¶ 14} The two-day trial of the custody issues commenced on April 13, 2016.  The juvenile court heard testimony from K.B., G.B., the GAL, Phinney, and Blackford.  The GAL recommended that it was in the best interest of all three minor children for the juvenile court to grant permanent custody to FCCS.  The GAL testified that his opinion regarding permanent custody of A.B. and J.B. had not changed since the first custody trial in 2014 when he also recommended an award of permanent custody to FCCS.  Blackford testified she made the decision to move forward with a motion for permanent custody of all three children, and she opined that granting permanent custody to FCCS was in the

children's best interest.  According to Blackford, she previously made the same recommendation at the 2014 permanent custody hearing for A.B. and J.B.  Phinney, who had been working with the family on the case plan since February 2015, testified that granting permanent custody to FCCS was in the best interest of all three children.

{¶ 15}  The juvenile court issued four judgment entries as a result of the permanent custody trial.  On April 21, 2016, the juvenile court issued a judgment entry granting permanent custody of E.B. to FCCS and terminating parental rights of K.B.  On May 26, 2016, the juvenile court issued a judgment entry granting permanent custody of E.B. to FCCS and terminating parental rights of G.B.  On May 26, 2016, the juvenile court issued a judgment entry granting permanent custody of A.B. to FCCS and terminating parental rights of G.B. and K.B.  The juvenile court issued a separate judgment entry on May 26, 2016 granting permanent custody of J.B. to FCCS and terminating parental rights of G.B. and K.B.

{¶ 16}  G.B. timely appealed to this court from the juvenile court's judgment entry of April 21, 2016, terminating his parental rights as to E.B., and the May, 26, 2016 judgment entry, terminating his parental rights as to A.B. and J.B.  K.B. timely appealed to this court solely from the juvenile court's April 21, 2016 judgment entry terminating her parental rights as to E.B.

## II.  ASSIGNMENTS OF ERROR

{¶ 17}  Appellant G.B. asserts the following assignment of error:

> The juvenile court's judgment granting permanent court commitment of the minor children to Franklin County Children Services was against the manifest weight of the evidence.

{¶ 18}  Appellant K.B. asserts the following two assignments of error:

> [1.] TRIAL COURT ERRED BY FAILING TO APPOINT AN INDEPENDENT PSYCHIATRIC EXPERT TO AID IN THE PRESENTATION OF THE MOTHER'S CASE WHEN THE STATE PRESENTED EVIDENCE OF THE MOTHER'S MENTAL HEALTH.
>
> [2.] TRIAL COURT ERRED BY FINDING CLEAR AND CONVINCING EVIDENCE THAT IT IS IN THE BEST INTEREST OF THE CHILD TO BE PERMANENTLY

> COMMITTED TO FRANKLIN COUNTY CHILDREN SERVICES AND THAT THE CHILD CANNOT OR SHOULD NOT BE RETURNED TO THE PARENTS IN A REASONABLE TIME.

## III. STANDARD OF REVIEW

{¶ 19} "A trial court's determination in a PCC case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. In reviewing a judgment granting permanent custody to FCCS under the manifest weight standard, " 'an appellate court "must make every reasonable presumption in favor of the judgment and the trial court's findings of facts." ' " *K.M.* at ¶ 13, quoting *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " ' "[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." ' " *K.M.* at ¶ 13, quoting *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988). " 'An appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence.' " *In re M.W.*, 10th Dist. No. 11AP-524, 2011-Ohio-6392, ¶ 20, quoting *In re Siders*, 10th Dist. No. 96APF04-413 (Oct. 29, 1996), citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992).

## IV. LEGAL ANALYSIS

{¶ 19} Parents have a basic and fundamental interest of the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio recognizes that it is the constitutionally protected right of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28. Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *K.M.* at ¶ 15, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

### A.  G.B.'s Sole Assignment of Error

{¶ 20} In G.B.'s sole assignment of error, G.B. contends that the juvenile court's permanent custody determination is against the manifest weight of the evidence.  We disagree.

### 1.  Custody of A.B. and J.B.

{¶ 21} FCCS moved for permanent custody of A.B. and J.B. on several statutory grounds, including R.C. 2151.414(B)(1)(a) and (d).  R.C. 2151.414(B)(1) reads, in relevant part, as follows:

> Except as provided in division (B)(2) of this section, *the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply*:
>
> (a)  The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b)  The child is abandoned.
>
> * * *
>
> (d)  The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the

> child was previously in the temporary custody of an equivalent agency in another state.

(Emphasis added.)

{¶ 22} R.C. 2151.414 governs the procedure for granting permanent custody of a child to a public agency such as FCCS. *K.M.* at ¶ 13. A decision to award permanent custody requires the juvenile court to take a two-step approach. *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18. Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody if after a custody trial the court determines, by clear and convincing evidence, that "(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child. Clear and convincing evidence means the measure of proof that produces ' "a firm belief or conviction as to the facts sought to be established." ' " *K.M.* at ¶ 14, quoting *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 23} In this case, the juvenile court made the following alternative findings under R.C. 2151.414(B)(1): (1) the circumstances under subsection (a) existed because the boys were not abandoned and had not been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period; (2) the circumstances under subsection (b) existed because the boys had been abandoned; and (3) both boys had been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period.

{¶ 24} With regard to circumstances in subsection (d), FCCS filed their second motion for permanent custody on June 24, 2015 and, at that time, the two boys had been in FCCS' custody since January 20, 2015. The boys were previously in FCCS' custody from September 24, 2010 through November 1, 2014. Thus, the undisputed evidence presented at the custody trial establishes that, pursuant to R.C. 2151.414(B)(1)(d), A.B. and J.B. had been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. Because the evidence supports the juvenile court's finding that the circumstances under R.C. 2151.414(B)(1)(d) exist, permanent custody shall be granted to FCCS as such relief is in the children's best interest. R.C. 2151.414(B)(1); *K.M.* at ¶ 14; *K.H.* at ¶ 42.

{¶ 25} G.B. contends, however, that we must reverse the juvenile court's custody determination because of obvious inconsistencies in the juvenile court's alternative findings under R.C. 2151.414(B)(1).  G.B. first contends that the juvenile court's finding that the circumstances set forth in R.C. 2151.414(B)(1)(d) existed is inconsistent with its alternative finding that the circumstances set forth in R.C. 2151.414(B)(1)(a) existed.  G.B. maintains that it is not logical for the juvenile court to find that A.B. and J.B. have been in the custody of FCCS for 12 or more months of a consecutive 22-month period for purposes of subsection (B)(1)(d) and also find that the boys have not been in the custody of FCCS for 12 or more months of a consecutive 22-month period for purposes of subsection (B)(1)(a).  G.B. also contends that the juvenile court's finding that the grounds set forth in R.C. 2151.414(B)(1)(a) existed is inconsistent with its finding that the grounds set forth in R.C. 2151.414(B)(1)(b) existed.  G.B. insists that the juvenile court cannot logically find that A.B. and J.B. are not abandoned for purposes of subsection (B)(1)(a) and also find that the children are abandoned for purposes of subsection (B)(1)(b).

{¶ 26} FCCS acknowledges that the trial court's alternative findings are inconsistent but argues that the inconsistencies do not require reversal of the juvenile court's judgment because the evidence supporting the juvenile court's finding under R.C. 2151.414(B)(1)(d) is uncontroverted.  We agree.

{¶ 27} FCCS filed the motion for permanent custody alleging, alternatively, that the grounds set forth in R.C. 2151.414(B)(1)(a) and (d) existed.  FCCS did not move the court for permanent custody on the grounds of abandonment under R.C. 2151.414(B)(1)(b).  In order for FCCS to establish grounds for permanent custody under R.C. 2151.414(B)(1), FCCS was required to prove, by clear and convincing evidence, that any of the circumstances under subsections (a) through (d) existed.  Because it is undisputed that on the date FCCS filed its second motion for permanent custody, A.B. and J.B. had been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period, G.B. cannot establish any prejudice arising from the juvenile court's alternative findings regarding abandonment for purposes of R.C. 2151.414(B)(1)(a) and (b).  *In re C.C.*, 12th Dist. No. CA2011-11-113, 2012-Ohio-1291, ¶ 22-23 (trial court did not err in making a finding that children could not be placed with the parents within a reasonable time under R.C. 2151.414(B)(1)(a) after finding that the children were

abandoned under R.C. 2151.414(B)(1)(b), as nothing prevented a trial court from making alternative findings). *See also In re Franklin*, 3d Dist. No. 9-06-12, 2006-Ohio-4841, ¶ 16 (because the juvenile court properly found the children abandoned under R.C. 2151.414(B)(1)(b) and because the custody award was in the children's best interest, the juvenile court's erroneous finding that the children were also within the agency's custody for the requisite period of time under R.C. 2151.414(B)(1)(d) was harmless error). In other words, the subjective finding of abandonment for purposes of subsections (a) and (b) is unnecessary where the juvenile court properly finds that grounds for custody exist under the objective standard set forth in subsection (d). *Id.*

{¶ 28} Under the statutory child custody scheme, if the juvenile court finds, by clear and convincing evidence, that any of the grounds listed in R.C. 2151.414(B)(1) exist, the juvenile court must award custody to the moving party if it also finds, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody. R.C. 2151.414(B). In determining the best interest of A.B. and J.B., the juvenile court was guided by R.C. 2151.414(D)(1), which provides, in relevant part, as follows:

> In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * *, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 29} In concluding the granting of permanent custody of A.B. and J.B. to FCCS was in the best interest of the children, the juvenile court considered and weighed the factors set forth in R.C. 2151.414(D)(1)(a) through (e). For purposes of subsection (a), there is no dispute that A.B. and J.B. have a strong bond with G.B. G.B. testified that he loves his boys and that they have a strong bond. The GAL testified the boys have also formed a bond with their current foster parents. Blackford maintained that A.B.'s and J.B.'s current foster parents have expressed a willingness to adopt both boys. Phinney testified that he visits A.B. and J.B. every two weeks at their foster home and that the boys have bonded with their foster parents. The witnesses were in agreement that A.B. and J.B. have a bond with each other.

{¶ 30} With regard to the wishes of A.B. and J.B., the GAL testified that A.B. wishes to reunite with G.B. but that J.B. has expressed a desire to live with G.B. and/or K.B. According to the GAL, J.B. also expressed a desire to live with one of his former foster parents, who he refers to as his "grandma." (Apr. 14, 2016 Tr. at 64.) Phinney testified that A.B. wants to live with G.B. but that J.B. has indicated to him he is afraid of G.B. G.B. testified that he believes A.B. will "run away" if the juvenile court grants custody to FCCS. (Apr. 13, 2016 Tr. at 107.)

{¶ 31} The boys' custodial history reveals G.B. went to jail following the October 2, 2010 domestic violence offense and that K.B. did not retain custody of the boys thereafter due to her drug addiction. FCCS obtained an order of temporary custody on October 8, 2010. The two boys were in FCCS' custody for the next four years. G.B. regained legal custody of A.B. and J.B. in November 2014. On December 31, 2014, Columbus Division of Police arrested G.B. for domestic violence. A.B. and J.B. stayed in the home with K.B. for a short time after G.B. went to jail, but FCCS removed the children on January 20, 2015 when it was discovered that K.B. was not submitting to drug and alcohol screens and not taking A.B. to his counseling appointments. On the date of the custody trial, A.B. and J.B. had been in the legal custody of FCCS for more than five and one-half of the last six years. Thus, the custodial history of the two boys overwhelmingly favors permanent custody to FCCS.

{¶ 32} With regard to R.C. 2151.414(D)(1)(d), "a legally secure permanent placement" is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs. *In re M.B.*, 4th Dist. No. 15CA19, 2016-Ohio-793, ¶ 56, citing *K.M.* at ¶ 28. The evidence in this case demonstrates that A.B. and J.B. need a legally secure permanent placement and that such placement cannot be achieved without a grant of permanent custody to the agency.

{¶ 33} On the date of the permanent custody trial, A.B. had recently turned nine years old and J.B. was just seven and one-half years of age. Given G.B.'s current incarceration, legally secure permanent placement with G.B. was not feasible. K.B. has not appealed from the juvenile court judgment terminating her parental rights to A.B. and J.B. Consequently, placement of the two boys with K.B. was not, and never will be, a viable option. A.B. and J.B. have been in FCCS' custody for more than five and one-half years at the time of the custody trial, with more than one set of foster parents during that time period. Their current foster parents have indicated a willingness to adopt the boys.

{¶ 34} The GAL stated that he has witnessed A.B. acting in a violent manner towards J.B. when A.B. believes no adults are watching. The GAL stated that A.B. witnessed the December 31, 2016 incident where his father choked his mother and that A.B. was struck by G.B. when he attempted to intervene. The GAL did not believe G.B. intended to harm A.B. The GAL testified that A.B. dominates J.B. and that J.B. is submissive to his older brother. In our view, the weight of the evidence supports the trial court's determination that A.B. and J.B. have an immediate need for a legally secure permanent placement and that such placement cannot be achieved without a grant of permanent custody to FCCS.

{¶ 35} In addition to the factors listed in R.C. 2151.414(D)(1)(a) through (e), the juvenile court is instructed to consider "all relevant factors" affecting the best interest of the child. In this regard, the evidence presented at the custody trial reveals that G.B.'s history of domestic violence and violence against women weighs heavily in favor of the juvenile court's conclusion that permanent legal custody to FCCS is in the best interest of A.B. and J.B.

{¶ 36} The testimony established several incidents of G.B. being violent. In her testimony, K.B. stated that G.B. had gotten physically violent with her on four occasions during their marriage and that police were called on each occasion. Additionally, in January 2014, G.B. pleaded guilty in Fairfield County Municipal Court to the charge of aggravated menacing after threatening to inflict serious physical harm to a woman he was arguing with over the telephone. In July 2014, G.B. pleaded guilty in Franklin County Municipal Court to the charge of disorderly conduct in connection with an incident involving a woman he was dating, C.F. G.B. received a 30-day suspended jail sentence for that offense and a two-year probationary period which included the condition that G.B. "stay away" from C.F. (July 30, 2014 Conditions of Probation.) G.B. also acknowledged that he was involved in a domestic dispute while he was living with a friend in California. According to G.B., the boyfriend of his friend's mother entered the home and pushed her down the stairs, whereon G.B. "commenced to stomping his ass." (Apr. 13, 2016 Tr. at 57.)

{¶ 37} Though appellant claimed that he has taken responsibility for his act of domestic violence against K.B., he denied and/or minimized the criminal conduct attributed to him, and he has blamed K.B. for the domestic violence he committed against her. For example, he blamed the December 31, 2014 domestic violence on a toothache and he asserted that K.B. "got shitty with me." (Apr. 13, 2016 Tr. at 39.) G.B. testified that if he had known K.B. was not to be living with him after he regained custody of the boys in September 2014 , then the incident that occurred on December 31, 2014 would not have happened. G.B. maintained that if he divorced K.B. and could "stay single" that there would be no risk he would commit domestic violence again. (Apr. 14, 2016 Tr. at 139.)

{¶ 38} When asked if a divorce from K.B. would resolve G.B's issue with domestic violence, the GAL testified as follows:

> No. And the reason why is there numerous other incidents in
> his record of while not escalating to violence in a household,
> of agg (sic) – there are a couple aggravated menacing charges
> and the like which demonstrate the same kind of behavior
> that were it turn in – were those – for example with [C.F.], I
> believe. If that was a domestic situation where they were
> living together, I would have – I would have fear that

> something could happen in a domestic violence. I'm not convinced that [G.B.] has addressed all the issues that are not specifically related to [K.B.], that lead to the domestic violence. * * * I have great fears that it would continue regardless of the spouse or girlfriend that [G.B.] was involved with.

(Apr. 13, 2016 Tr. at 237-38.)

{¶ 39} K.B. testified that both A.B. and J.B. witnessed G.B.'s violence against her during the 2010 and 2014 incidents. The juvenile court found that "the parents did fail to remedy the problems of domestic violence" and that G.B. is affected by "[c]hronic [e]motional [i]llness" in the form of "domestic violence." (May 26, 2016 Jgmt. Entry at 5, 7.) The record contains clear and convincing evidence in support of the trial court's finding.

{¶ 40} Similarly, the record overwhelmingly supports the juvenile court's finding that G.B.'s repeated incarcerations have prevented him from providing care to A.B. and J.B. G.B. has been jailed, imprisoned, and subject to a stay-away order, all of which have prevented him from caring for A.B. and J.B. for most of their relatively short lives. G.B. went to jail following the October 2010 domestic violence offense. He regained physical custody of the boys in mid-September 2014, but he went to jail again on December 31, 2014. G.B. could not raise bail, and he remained in jail following his arrest and subsequent conviction. On G.B.'s release from jail in 2015, the five-year stay-away order prohibited him from having contact with K.B. and A.B. The stay-away order was still in place when G.B. was arrested in August 2015. G.B. subsequently pleaded guilty to forgery and tampering with evidence. G.B. remained in jail while the Licking County charges were pending, he was in prison at the time of the permanent custody hearing, and he was not scheduled to be released for another 16 months.

{¶ 41} As a consequence of his various incarcerations and the stay-away order, G.B.'s bid to regain legal custody at the recent custody trial was based largely on the period of time between mid-September and December 31, 2014, when G.B. had physical custody of A.B. and J.B. G.B. claims that his custody of the boys during this period of time

demonstrates that he has the ability to successfully parent A.B. and J.B.[1]  In our view, this time frame shows an unsuccessful ability to parent.  Just seven weeks after regaining legal custody of A.B. and J.B., G.B. committed acts that resulted in his second conviction for domestic violence.

{¶ 42}  Pursuant to R.C. 2151.414(D)(1)(e), the juvenile court may also consider the factors set forth in R.C. 2151.414(E)(7) through (10) in conducting the best-interest analysis.  The juvenile court found that the factor listed in subsection (E)(10) applied because G.B. had abandoned A.B. and J.B. by failing to have contact with either child for a 90-day period.  G.B. takes exception to the trial court's finding that he abandoned A.B. and J.B., arguing that the weight of the evidence does not support a finding that he intended to relinquish his parental rights to A.B. and J.B. either during his repeated incarcerations or the stay-away order.

{¶ 43}  R.C. 2151.011(C) provides that "[f]or the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."  G.B. claims that other appellate districts treat the 90-day period as creating a rebuttable presumption of abandonment which may be overcome by evidence that the parent did not intend to relinquish parental rights.  *See In re Cravens*, 3d Dist. No. 4-03-48, 2004-Ohio-2356; *In re Custody of C.E.*, 2d Dist. No. 2005-CA-11, 2005-Ohio-5913.

{¶ 44}  This court, however, has taken the position that the question whether a parent intended to relinquish parental rights is irrelevant to a determination of abandonment for purposes of R.C. 2151.414(E)(10) because "R.C. 2151.011(C) does not contain a requirement of any particular 'intent' on behalf of the parent; rather, the provision defines 'abandonment' solely in terms of the time between contacts."  *In re D.P.*, 10th Dist. No. 06AP-780, 2007-Ohio-1703, ¶ 7.  *Accord In re I.H.*, 10th Dist. No. 16AP-463, 2017-Ohio-815, ¶ 16; *In re B.B.H.*, 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 34;

---

[1] We note that K.B. testified she provided care for A.B. and J.B. during the three and one-half month period between mid-September and December 31, 2014, when G.B. had physical custody of the two boys.  According to K.B., G.B. would frequently leave the home on the weekend and not return until Monday night.

*In re A.E.,* 10th Dist. No. 07AP-685, 2008-Ohio-1375, ¶ 26. Thus, the evidence supports the juvenile court's finding of abandonment, G.B.'s subjective intent notwithstanding.

{¶ 45} We note that the juvenile court also made a finding that "[G.B.] is incarcerated for a violation of domestic violence, assault, threats and aggravated menacing by conviction or guilty plea, until August, 2017 from sentencing on January 16, 2015." (May 26, 2016 Jgmt. Entry at 5.) The record establishes that G.B. served jail time for two domestic violence convictions, an aggravated menacing conviction, and a conviction of disorderly conduct, but he was not incarcerated for domestic violence at the time of the custody trial. Rather, G.B. was serving a prison term for forgery and tampering with evidence. G.B. argues that this finding significantly impacted the juvenile court's best-interest analysis. We disagree.

{¶ 46} We read the juvenile court's finding merely as a recitation of some of the charges for which G.B. has pleaded guilty and received a jail sentence, along with the acknowledgment that G.B. is currently incarcerated. There is nothing in the juvenile court's judgment entry suggesting that the juvenile court mistakenly believed that G.B. had been convicted of a third domestic violence charge. Consequently, any lack of clarity with regard to the juvenile court's factual finding resulted in no prejudice to G.B.

{¶ 47} G.B. argues that the juvenile court record contains evidence which would support a finding that returning custody to G.B. would be in the best interest of A.B. and J.B. For example, G.B. presented credible evidence that he completed an assessment for alcohol and other drugs and that he substantially complied with all required drug testing after he regained physical custody of A.B. and J.B. in 2014. G.B. also presented evidence that he has taken a number of domestic violence classes in between various incarcerations and while incarcerated. G.B. testified that he recently began participating in an anger management class at LCC and that he is on a waiting list for parenting classes. He claims that he has served his current prison term without receiving any conduct reports or being involved in disputes with other inmates. G.B. believed that he would receive an early release provided he continued to stay out of trouble in prison. He assured the juvenile court that he has taken steps to secure employment and adequate housing on his release from prison.

{¶ 48} In discussing the best interests of his children, G.B. testified as follows:

Q. So what are you asking this Court to do?

A. To give me some time, give me a caseworker I can – I can work with and work on a case plan while I'm incarcerated 'cause (sic) I know I can do better incarcerated behind bars on a case plan. 'Cause (sic) I'm more committed there than I could be out here. I mean, I'm going to learn – I'm going to be able to learn more there than I would be out here on the streets. Just give me some time to work a case plan, give me a little time to get my head together.

(Apr. 14, 2016 Tr. at 138-39.)

{¶ 49} At best, G.B.'s testimony permits an inference that G.B. will satisfy the requirements for regaining custody of the boys and for removing the stay-away order at some point in time following his release from prison. The GAL recommended that the juvenile court grant custody in favor of FCCS, as did both of the PFSN employees who were involved with this family.

{¶ 50} Judging the credibility of witnesses is an inherent part of a juvenile court's responsibility in permanent custody cases. *In re Jones*, 10th Dist. No. 01AP-616 (Dec. 27, 2001). The underlying rationale of giving deference to the findings of the juvenile court in permanent custody cases rests with the knowledge that the juvenile court judge is best able to view the witnesses, observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *In re T.L.*, 10th Dist. No. 07AP-326, 2007-Ohio-4802, ¶ 6, citing *In re Abram*, 10th Dist. No. 04AP-220, 2004-Ohio-5435. In this particular matter, we attach significance to the fact the juvenile court  judge who presided over the 2016 custody trial is the same judge who denied FCCS' motion for permanent custody in 2014 and returned legal custody to G.B. The juvenile court gave G.B. another chance to prove that he could provide a safe home for the children in 2014. G.B. lost that chance when he committed domestic violence just seven weeks after regaining legal custody and, thereafter, committed the crimes in Licking County that resulted in his current incarceration.

{¶ 51} The juvenile court determined that it was not in the children's best interest to wait for G.B. to follow through on his most recent promises and assurances. *See In re J.M.D.*, 4th Dist. No 14CA2, 2014-Ohio-1609 (though the mother claimed she has

attempted to better herself while incarcerated, the trial court was not required to afford her reasonable time to prove that she would be able to properly care for the child). On this record, we cannot say that the juvenile court lost its way in resolving credibility issues and weighing the relevant evidence in concluding, by clear and convincing evidence, it was in the best interest of A.B. and J.B. to grant permanent custody to FCCS. Accordingly, we overrule G.B.'s sole assignment of error as it relates to permanent custody of A.B. and J.B.

### 2. Custody of E.B.

{¶ 52} In G.B.'s sole assignment of error, he also contends that the juvenile court's permanent custody determination regarding E.B. is against the manifest weight of the evidence. We disagree.

{¶ 53} R.C. 2151.413 sets forth guidelines for determining when a public children services agency or private child placing agency must or may file a motion for permanent custody. *M.W.* at ¶ 34. FCCS moved for permanent custody of E.B., pursuant to R.C. 2151.353(A), which provides, in relevant part, as follows:

> If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:
>
> * * *
>
> (4) Commit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child.

{¶ 54} Pursuant to R.C. 2151.414(E), if the court determines, by clear and convincing evidence, at a hearing held, pursuant to R.C. 2151.353(A)(4), that one or more of the factors listed in R.C. 2151.414(E)(1) through (16) exist as to each of the child's parents, the court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." R.C. 2151.414(E).

Accordingly, the evidence on this issue pertaining to both G.B. and K.B. must be examined.

{¶ 55} The juvenile court found, pursuant to R.C. 2151.414(E)(2), that K.B. is affected by "chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing." The juvenile court further found that R.C. 2151.414(E)(4) applied to K.B. because she is "likely to fail to have commitment to [E.B.] by failing to support, visit and communicate." (Apr. 21, 2016 Permanent Custody Jgmt. Entry at 5.) With regard to G.B., the juvenile court found, pursuant to R.C. 2151.414(E)(2), that G.B. is affected by domestic violence and that, pursuant to R.C. 2151.414(E)(13), G.B. is repeatedly incarcerated and his repeated incarceration prevents him from providing care for E.B. In addition, the juvenile court found that the factor listed in R.C. 2151.414(E)(10) existed as to both parents because both K.B. and G.B. had abandoned E.B. by not having contact with her for more than 90 days. Our review of the record reveals competent, credible evidence to support each of the findings made by the juvenile court pursuant to R.C. 2151.414(E).

{¶ 56} On cross-examination, K.B. acknowledged that her oldest three children are living with her mother because she has "a really bad drug problem." (Apr. 14, 2016 Tr. at 6.) K.B. acknowledges in her brief in this court that an alcohol and drug assessment has identified her as chemically dependent and suffering from bi-polar disorder. The case plan initially developed by FCCS in this case and approved by the juvenile court identified several issues that K.B. needed to work on including her alcohol and drug use, her victimization by her husband's domestic violence, her mental health condition of depression, and housing and financial stability. Phinney testified that the case plan also required K.B. to undergo an alcohol and drug assessment and to complete periodical urine screenings. Phinney testified that K.B. did not meet any of the goals set out in the case plan. According to Phinney's records, of the 62 drug and alcohol screenings requested for K.B., she completed only 8. Consequently, K.B. has nothing to corroborate her claim that she is drug and alcohol free. Phinney also testified that K.B. participated "[m]inimally" in the domestic violence education classes referred to her and that she was unsuccessfully terminated from the program. (Apr. 13, 2016 Tr. at 160.)

{¶ 57} With regard to abandonment under R.C. 2151.414(E)(10), there is no dispute that K.B. has not visited E.B. since she left the hospital on October 31, 2015. K.B. claims that she did not visit E.B. because the foster parents reportedly told Phinney that they did not want to meet her. K.B. acknowledged on cross-examination, however, that she is aware that meeting the foster parents is not a condition of her visitation with E.B. She also admitted that on several of the instances where she attempted to reach Phinney by telephone, she had not left a message. K.B. acknowledged "that's where I was wrong, I guess." (Apr. 14, 2016 Tr. at 59.) Phinney testified that K.B. came into the office to see him on April 4, 2016, just days before the custody trial. According to Phinney, K.B. asked about resuming visitation with A.B. and J.B., but she did not inquire about visiting E.B. Though the record also contains support for K.B.'s complaints about Phinney's availability and lack of follow-through, our review of the record reveals sufficient, competent, credible evidence to support the juvenile court's finding that K.B. abandoned E.B. by failing to visit her for more than 90 days. At a minimum, the evidence supports the juvenile court's finding, pursuant to R.C. 2151.414(E)(4), that K.B. is "likely to fail to have commitment to [E.B.] by failing to support, visit and communicate." (Apr. 21, 2016 Jgmt. Entry at 5.)

{¶ 58} As earlier discussed in this decision, the evidence in the record supports the juvenile court's finding that G.B. is affected by serious unresolved domestic violence issues. R.C. 2151.414(E)(2). The juvenile court also found, pursuant to R.C. 2151.414(E)(10), that G.B. abandoned E.B. In our view, the record contains clear and convincing evidence to support the juvenile court's finding. At a minimum, the record contains sufficient, competent, credible evidence to support the juvenile court's finding, by clear and convincing evidence, that G.B.'s repeated incarceration prevented him from caring for E.B. R.C. 2151.414(E)(13).

{¶ 59} Pursuant to R.C. 2151.353 and 2151.414(E), the existence of even one of the factors listed in subsection (E)(1) through (16) as to each parent requires a finding by the juvenile court that E.B. cannot be placed with either parent within a reasonable time or should not be placed with G.B. Based on our review of the juvenile court record, we find that competent, credible evidence supports the juvenile court's findings made, pursuant to R.C. 2151.414(E), as to both G.B. and K.B. Thus, R.C. 2151.353(A)(4) requires this court to affirm the juvenile court's custody determination regarding E.B. if the evidence

supports the juvenile court's determination that granting permanent custody to FCCS is in E.B.'s best interest.

{¶ 60} In conducting the best-interest analysis under R.C. 2151.414, the juvenile court found that it was in E.B.'s best interest to grant permanent custody to FCCS. In making this determination, the juvenile court found that E.B.'s need for a legally secure permanent placement was paramount given E.B.'s "medically fragile" condition. (Apr. 21, 2016 Jgmt. Entry at 3.) The juvenile court found that legally secure permanent placement for E.B. cannot be achieved without a grant of permanent custody to the agency. As noted in connection with the best-interest analysis as to A.B. and J.B., this court has observed that legally secure permanent placement requires more than a stable home and income but also requires an environment that will provide for a child's particular needs. *K.M.* at ¶ 28. As previously detailed, E.B. suffers from several serious medical conditions that require round-the-clock care. Her medical conditions include paralyzed vocal chords, Stridor syndrome, a congestive heart defect, and a prematurely closed skull. She breathes by means of a tracheotomy and breathing tube, and she receives nutrition exclusively through a feeding tube.

{¶ 61} The record shows that E.B. remained at the hospital for the first two months of her life and that she never resided with K.B. K.B. claimed that she would be able to care for E.B. with proper training and the help of a nurse. She was unaware, however, that E.B.'s breathing tube had to be cleared every three or four minutes. She estimated that it should be cleaned "[p]robably every day." (Apr. 14, 2016 Tr. at 43.) When asked if she received any training at the hospital during the first two months of E.B.'s life, she stated that she received training in bottle feeding. Yet K.B. acknowledged on cross-examination that E.B. receives all her nutrition through a feeding tube. Additional relevant evidence produced at the custody trial establishes that E.B. has formed some bond with her foster mother and that E.B.'s foster mother wishes to adopt her.

{¶ 62} G.B.'s appellate brief contains little argument relevant to E.B. G.B. was in prison when E.B. was born, and he has never met his daughter. He was also unaware that E.B. suffers from several serious medical conditions until he learned of them at the custody trial. G.B. testified that he has doubts about the paternity of E.B. because K.B. allegedly told him E.B. was the child of one of G.B.'s friends.

{¶ 63} G.B. did challenge the trial court's finding that he "is incarcerated for a violation of 2919.25(A), domestic violence to wife and child, [A.B.] on December 31, 2014." (Apr. 21, 2016 Jgmt. Entry at 5.) As we have discussed, G.B. was charged with domestic violence against A.B., but he did not plead guilty to that charge. G.B. was convicted and sentenced to a jail term for domestic violence against K.B. both in 2010 and 2014. He also has an extensive history of domestic violence and violence against women. Even though G.B.'s current incarceration is for convictions of forgery and tampering with evidence, not domestic violence, the record establishes clearly and convincingly that G.B. has unresolved issues with domestic violence. Moreover, because E.B.'s need for legally secure permanent placement is critical due to her serious medical conditions, it is difficult to conceive how placement with either parent could possibly be in the best interest of E.B. Thus, the juvenile court's finding regarding the reason for G.B.'s current incarceration, though erroneous, did not unfairly prejudice his effort to retain permanent custody of E.B.

{¶ 64} For the foregoing reasons, we find that the evidence in the record supports the juvenile court's finding that E.B. cannot or should not be placed with either K.B. or G.B. and that permanent placement with FCCS is in the best interest of E.B. Accordingly, we hold that the juvenile court did not err when it awarded custody of E.B. to FCCS and terminated the parental rights of both K.B. and G.B. Having so held, we overrule G.B.'s sole assignment of error.

### B. K.B.'s First Assignment of Error

{¶ 65} In her first assignment of error, K.B. argues that the trial court erred by failing to appoint an independent psychiatrist to assist her in the presentation of her case when the state presented evidence of the mother's mental health. We disagree.

{¶ 66} Termination of parental rights has been referred to as " 'the family law equivalent of the death penalty in a criminal case.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). Consequently, parents " 'must be afforded every procedural and substantive protection the law allows.' " *Hayes* at 48, quoting *Smith* at 16. The evidence establishes that K.B. underwent a court-ordered mental health assessment in connection with the neglect and dependency complaint. The evaluation identified her as chemically dependent and suffering from bi-polar disorder. K.B. testified at the custody trial that she suffers from intermittent bouts of severe

depression that have required multiple hospitalizations. She also maintained that she has undergone several brain surgeries, but she did not produce medical records to corroborate that claim.

{¶ 67} K.B. did not move the juvenile court for the appointment of a psychiatric expert to assist her in the case, and FCCS did not submit the testimony of a psychiatric expert in support of the motion for permanent custody. Nevertheless, K.B. contends that due process required the juvenile court to, sua sponte, appoint a psychiatrist to assist her in this case. We disagree.

{¶ 68} We find the case of *In re Shaeffer Children*, 85 Ohio App.3d 683 (3d Dist.1993), to be instructive on this issue. In that case, the department of children's services found that the Schaffer's minor children were dependent due to the mother's inability to care for the children and the father's lack of concern and support. At the permanent custody trial, the juvenile court denied the mother's motion for the appointment of a psychiatric expert to assist in her defense. The juvenile court subsequently granted permanent custody to the department for purposes of adoption. The mother appealed. The Third District Court of Appeals reversed the juvenile court's judgment, concluding that the juvenile court erred when it denied the indigent mother's motion for appointment of a psychiatrist. *Id.* at 691. Therein, the Third District stated:

> [W]e find the private interests of Kim Shaeffer and her two minor children to be compelling. In cases such as this, where the parent's mental health is the principal issue, the risk of erroneous deprivation is a serious one and the merits of the proposed procedural safeguard are significant. Finally, we find the state's interest in economic and administrative efficiency to be comparatively weak and the prospective additional burden to be relatively slight. We therefore conclude that Kim Shaeffer's motion for a court-appointed psychiatric expert to assist in the preparation of her defense should have been granted.

*Id.*

{¶ 69} In reaching this conclusion, the Third District issued the following cautionary language:

> Having reached this conclusion, we believe it important to clarify the breadth of our decision. We are not holding that

> due process requires the appointment of a psychiatric expert in every permanent custody proceeding where a parent's mental health is made an issue. However, in this case, because the indigent parent's mental or emotional health was clearly the predominant issue from the outset and ultimately became the determinative issue, and because the parent made a timely request for such assistance, we hold that the assistance of a court-appointed psychiatric expert was mandated by the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution.

*Id.*

{¶ 70} In a subsequent decision examining *Shaeffer,* the Third District held that the appointment of a psychiatrist to assist a parent in a permanent custody hearing is unnecessary where the parent's mental condition is *not* the predominate issue in the case, regardless of whether the parent timely requested such an appointment. *In re Sherman*, 3d Dist. No. 5-04-47, 2005-Ohio-5888, ¶ 26, following *Shaeffer.*

{¶ 71} In this case, K.B. did not make a request for the appointment of a psychiatric expert to assist her at the custody trial. K.B. has not cited any case law requiring the appointment of a psychiatric expert to assist a parent in a permanent custody proceeding in the absence of a request for such an appointment. Nor has this court found any such case. Moreover, as noted above, the juvenile court predicated its custody determination primarily on E.B.'s "medically fragile" condition. (Apr. 21, 2016 Jgmt. Entry at 3.) The juvenile court expressly stated that other considerations, such as K.B.'s mental health condition, were secondary. On this record, we find that K.B. was not entitled to the appointment of a psychiatric expert and that due process did not require the juvenile court to, sua sponte, appoint such an expert. *See In re Hogle*, 10th Dist. No. 99AP-944 (June 27, 2000) (parents' trial counsel was not ineffective for failing to move the juvenile court for the appointment of a psychiatric expert because the parents' substance abuse was the principal or primary reason for the complaint for permanent custody, not the parents' mental condition).

{¶ 72} For the foregoing reasons, K.B.'s first assignment of error is overruled.

### C.  K.B.'s Second Assignment of Error

{¶ 73} In K.B.'s second assignment of error, K.B. argues that the juvenile court erred in finding, by clear and convincing evidence, that awarding permanent custody to FCCS is in the best interest of E.B. and that E.B. cannot or should not be returned to either parent within a reasonable time.  As noted in connection with G.B.'s sole assignment of error, FCCS moved for permanent custody of E.B. pursuant to R.C. 2151.353(A)(4).  In overruling G.B.'s sole assignment of error, we determined that the clear and convincing evidence in the record supports the juvenile court's conclusion, pursuant to R.C. 2151.353(A)(4), that E.B. cannot or should not be placed with either K.B. or G.B. and that permanent placement with FCCS is in the best interest of E.B. Accordingly, for the reasons set forth in our ruling on G.B.'s sole assignment of error, we overrule K.B.'s second assignment of error.

## V.  CONCLUSION

{¶ 74}  Having overruled appellants' assignments of error, we affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

KLATT and BRUNNER, JJ., concur.

_____