[Cite as *In re L.R.*, 2023-Ohio-1385.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In re:                                                   :
[L.R. et al.,                                                            No. 22AP-197
                                                         :           (C.P.C. No. 18JU-11703)
L.D.R., Father,
              Appellant].                                :             No. 22AP-198
                                                                    (C.P.C. No. 18JU-11707)
                                                         :
                                                                      No. 22AP-199
                                                         :           (C.P.C. No. 18JU-11710)

                                                         :             No. 22AP-200
                                                                    (C.P.C. No. 19JU-10033)
                                                         :
                                                            (ACCELERATED CALENDAR)

D E C I S I O N

Rendered on April 27, 2023

**On brief***: Campbell Law, LLC*, and *April F. Campbell*, for
appellant, L.D.R., father.

**On brief:** *Jessica M. Ismond*, for appellee, Franklin County
Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BEATTY BLUNT, P.J.

{¶ 1}   Appellant, L.D.R., father, appeals the March 1, 2022 decision and judgment
entries from the Franklin County Court of Common Pleas, Division of Domestic Relations,
Juvenile Branch, terminating the parental rights of appellant and granting permanent
custody of Le.R., Leg.R., L.R., and Lo.R. (collectively, the "children"), to Franklin County
Children Services ("FCCS").  For the following reasons, we affirm.

## I.  Facts and Procedural History

{¶ 2}   On October 4, 2018, FCCS filed three separate complaints in the Franklin
County Court of Common Pleas, Domestic Relations, Juvenile Division under Franklin C.P.

Nos. 18JU-11703, 18JU-11707 and 18JU-11710, alleging that appellant's children,[1] Le.R. (d.o.b. 06/07/2017), Leg.R. (d.o.b. 06/29/2018), and L.R. (d.o.b. 08/28/2014) were abused, neglected, and dependent children. On August 28, 2019, FCCS filed a fourth complaint under Franklin C.P. No. 19JU-10033 alleging that appellant's child, Lo.R. (d.o.b. 08/26/2019) was an abused, neglected, and dependent child.

{¶ 3} On October 11, 2018, the court ordered L.R., Le.R., and Leg.R. be removed from the care of appellant and their mother, M.H ("Mother"). (Oct. 11, 2018 Mag.'s Orders.) On December 18, 2018, the court adjudicated L.R. neglected and dependent under case No. 18JU-11710. (Jan. 10, 2019 Jgmt. Entry.) On the same date, the court also adjudicated Le.R. and Leg.R. abused, neglected, and dependent children under case Nos. 18JU-11703 and 18JU-11707. (Jgmt. Entry.) On August 29, 2019, the court ordered Lo.R. be removed from the care of appellant and M.H., and on November 25, 2019, the court adjudicated Lo.R. an abused, neglected, and dependent child under case No. 19JU-10033. (Dec. 3, 2019 Jgmt. Entry.) On the respective dates of the adjudicatory hearing for each of the children, the court granted FCCS a post-adjudication order of temporary custody ("TCC").

{¶ 4} On November 15, 2020, FCCS filed motions for Permanent Court Commitment ("PCC") of L.R., Le.R., and Leg.R., and on November 17, 2020 FCCS filed a motion for PCC of Lo.R. All four cases proceeded to trial on FCCS' motions for PCC commenced on November 1, 2021. At trial, FCCS called two witnesses: the children's Guardian ad Litem ("GAL"), Jason Russ, and the ongoing caseworker from Permanent Family Solutions Network ("PFSN"), Tina Brown. After FCCS rested its case, no other evidence was presented.[2] The following evidence was adduced at trial.

{¶ 5} The GAL, Jason Russ, testified first and provided the following testimony. Jason Russ was appointed to serve as the GAL for all four children. He had been the GAL for the three older children (L.R., Le.R., and Leg.R.) since October 2018 and for the youngest child (Lo.R.) since October 2019. He had been out to the foster home "at least six times, probably eight to ten times." (Nov. 1, 2021 Tr. at 13.) He also had observed a visit

---

[1] All of the children's names begin with the letter "L," and therefore additional abbreviations are used herein to differentiate them for clarity. The oldest is L.R., a female born 08/28/2014; the next oldest is Le.R., a male born 06/07/2017; the next oldest is Leg.R., a male born 06/29/2018; and the youngest child part of this case is Lo.R., a male born 08/26/2019.

[2] Appellant did not appear at trial.

between appellant, M.H., and three of the children that occurred in February 2021. He testified that while the visit he observed was appropriate, he was not able to determine whether "a whole lot of a bond" existed between appellant, Mother, and the children. (Tr. at 13.) He further testified that although Mother was present during this entire visit, appellant was "gone about half the time" because he went to purchase food for the visit. (Tr. at 13-14.)

{¶ 6} Russ testified that he was unable to have more than one observed visit between appellant, Mother, and the children because their visits had been "sporadic at best and they'd been suspended since March of this year [2021]." (Tr. at 14.) He was unaware of any time during the pendency of the case when appellant and Mother consistently visited with the children. He had almost no contact with appellant or Mother during the pendency of the case. He never had accurate up to date contact information for appellant or Mother, and they had never called him or contacted him in any way.

{¶ 7} Russ testified that during the times he visited the children's foster home, he was able to meet the children's foster mother and foster father. He never observed anything of concern in the foster home. Russ testified that the children were "very much bonded to the foster parents." (Tr. at 14-15.) He further testified that while he had spoken to L.R. and tried to talk to the other children about what permanent custody means and express their wishes, L.R. was the only child who was old enough to understand what it means and to express her wishes. Russ had spoken with L.R. at least four times about her wishes and she expressed to him that she wished to remain with her current foster family.

{¶ 8} Finally, Russ testified that his recommendation was that FCCS receive permanent custody of all four children.

{¶ 9} Following the testimony of the GAL, FCCS called child welfare caseworker Tina Brown to testify. Tina Brown testified she was the assigned caseworker for the children since November 2, 2018. She testified that paternity for appellant had been established only for Le.R., but that appellant is the putative father for the other children.

{¶ 10} Brown testified that FCCS became involved with the family after Leg.R. was born and the baby "tested positive at birth."[3] Brown testified that appellant and Mother, who both lived with the children's maternal grandmother, were involved in drugs and there

---

[3] The record does not reflect for what specific substance or substances the baby tested positive.

was drug paraphernalia laying around the home. The children were initially placed with their maternal grandmother with a safety plan in place, but a violation occurred when Mother was left alone with the children, at which point the children were removed from the home. FCCS received temporary custody of L.R., Le.R., and Leg.R. on October 22, 2018, and of Lo.R. on August 29, 2019. Each of the children remained in the custody of FCCS since the initial custody dates.

{¶ 11} Brown further testified that, at the time of the hearing on the PCC motions, she was not sure of the whereabouts of either appellant or Mother or where they were residing. Brown had contact with appellant and Mother via text messaging and phone calls, but they did not always respond to her attempts to contact them. She had intermittent contact with them during the pendency of the case and had contacted them the Friday before the hearing "but they never responded." (Tr. at 24.) During the course of the time Brown had worked with appellant and Mother, they had only one established residence where Brown could visit with them and that was at the very beginning of the case when they were still living with the children's maternal grandmother. Brown was aware that appellant and Mother had been served with process of the motions for PCC by publication because the process server reported they were not living at the address they had provided.

{¶ 12} Brown testified that she had attempted to meet with appellant and Mother "many, many of - - many times" to discuss why they were unable to make visits with the children and to review the case plan. She testified she scheduled at least six meetings but "they would always say that they never got the information[,] that I never set it up. So I made sure I texted them so that I could, * * * have something to show them and say I did text you, to set up a time to meet." (Tr. at 26-27.)

{¶ 13} As part of her case plan, Mother was required to complete drug screens, an alcohol and drug ("AOD") assessment, mental health assessment, domestic violence assessment, and parenting classes. Despite having been given information by Brown to link with the services needed to complete her case plan objectives, including referrals and phone numbers, Mother completed only a domestic violence assessment and one urine screen. Brown testified Mother never completed the AOD assessment.

{¶ 14} As part of his case plan, appellant was required to complete an AOD assessment, domestic violence assessment, drug screens, parenting classes, and establish

safe and stable housing and verifiable income. Brown provided appellant with information to help him complete his case plan objectives, including providing him with phone numbers and referrals. Brown testified that she discussed the importance of completing the case plan with appellant, but he told Brown that "he should not have to complete any case plan services" because the children were removed due to Mother's actions, not his. (Tr. at 30-31.) Brown testified that during the pendency of the case, appellant did not take any steps to complete any aspect of the case plan.

{¶ 15} Brown next testified regarding appellant and Mother's visitation with the children. She testified that appellant and Mother were permitted to visit with the children every week. Mother was in and out of jail during the case, and she visited with the children no more than 15 times since the case opened in 2018. When visits did occur, appellant and Mother would usually visit the children together unless Mother was in jail, in which case appellant "did come sometimes to the visit and see the kids." (Tr. at 32.) The last visit of Mother and appellant was on March 24, 2021. Brown testified that the parents' visitation had been suspended due to lack of showing up for visits on a consistent basis. Brown testified that in order for them to have their visits reinstated, appellant and Mother were required to come in and meet with Brown, her supervisor, and the person who helps set up the visits. Brown testified that despite having scheduled at least six appointments with the parents to come in and meet, despite having been advised as recently as August 2021 that they could just come in any Monday, Tuesday, or Wednesday of any week to meet, as of the date of the hearing Brown had heard nothing from either of them.

{¶ 16} Brown testified that she was unaware of any relatives who wished or were able to have placement of the children. FCCS spoke with appellant's mother, Mother's mother, and Mother's brother as possible placement options, but each was either uninterested or unable to take all the children together or was otherwise not able to be approved.

{¶ 17} Brown further testified that the children were all placed together in the same foster home which had been the same foster home since their respective removals in 2018 and 2019. Brown testified that the children are "very, very bonded" to their foster parents. (*Id.* at 35) Brown was usually at the foster home for at least one hour every month, where she watched the children interact with the foster parents and the other children in the home

and observed the children "always going up to * * * both foster parents and hugging them" and asking for things.  (Tr. at 35.)  Brown also testified that the children are very bonded with each other and always play together and do everything together.  Brown testified the foster home where the children are currently placed had been identified as a prospective adoptive foster home, and the foster parents would like to adopt all the children.

{¶ 18}  Brown testified she had an opportunity to observe the visits between appellant, Mother, and the children.  She testified that Leg.R. was "definitely not" bonded to appellant and Mother and that she would cry, "especially when the kids would get there to the office." (Tr. at 36-37.)  Leg.R. "had actually vomit[ed] a couple of times." (Tr. at 37.) Brown testified that Le.R. was "not so much" bonded to appellant and Mother; and that L.R. was bonded at the beginning of the case when appellant and Mother's visits were still occurring, but after several missed visits, the bond started to diminish.  (Tr. at 36.) Brown further expounded on her testimony by explaining that Le.R. and L.R. would just ask their parents for their phones "and they would just pretty much sit on the phones and play on [them] pretty much most of the time" except when appellant or Mother brought food, at which point they would stop to eat.  *Id.*  Brown further testified on this point, "[b]ut other than that, they - - they really didn't * * * want to sit next to the parents too much."  (Tr. at 36-37.)  Brown testified that Lo.R. also did not seem to be very bonded to appellant and Mother.  Brown testified that Lo.R. "would cry quite a bit" and "would scream most of the visit and then be ready to go or want to come to me and wanted to leave."  (Tr. at 37.)

{¶ 19}  Finally, Brown testified that she agreed with the GAL's assessment that L.R. is the only child who really understands what permanent custody means and is able to express her wishes.  Brown testified that when she spoke with L.R. the month before the hearing and asked her where she would want to live if she could live anywhere, L.R.'s response was that she wanted to live with her foster parents "until I get married." (Tr. at 37-38.)  Brown testified that all four of the children are in need of a legally secure permanent placement, and that her recommendation is permanent custody for the purpose of adoption.

{¶ 20}  Following the trial, on March 1, 2022, the trial court issued a judgment entry sustaining FCCS' motions for permanent custody and divesting the parents of their parental rights.  The trial court considered each of the factors in R.C. 2151.414(D) and determined

there was clear and convincing evidence that it was in the children's best interest to grant the motion for permanent custody.

{¶ 21} This timely appeal followed.

## II. Assignment of Error

{¶ 22} Appellant assigns the following errors for our review:

> [I.] The trial court plainly erred in admitting the Guardian ad Litem's testimony.
>
> [II.] The trial court's decision to grant permanent custody of [appellant] children to Franklin County Children Services should be reversed, because it is not in the children's best interest.

## III. Standard of Review

{¶ 23} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28; *In re B.B.H.*, 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 14. "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8. Accordingly, an appellate court " 'will not overturn a permanent custody order when it is supported by competent, credible evidence.' " *In re M.W.*, 10th Dist. No. 11AP-524, 2011-Ohio-6392, ¶ 20, quoting *In re Siders*, 10th Dist. No. 96APF04-413, 1996 Ohio App. LEXIS 4805 *9 (Oct. 29, 1996), citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992). Further, "[i]n reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *Id.*, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

## IV.  Discussion

### A.  First Assignment of Error

{¶ 24}  In apellant's first assignment of error, he asserts the trial court plainly erred in admitting the GAL's testimony.  We disagree.

{¶ 25}  Counsel for appellant did not object to the admission of the GAL's testimony in the trial court.  Therefore, as appellant concedes, we review this assignment of error for plain error in considering whether the trial court erred by admitting the GAL's testimony. *In re D.E.*, 10th Dist. No. 20AP-83, 2021-Ohio-524, ¶ 76.  "In civil cases, the plain error doctrine is not favored and may only be applied in the extremely rare case involving exceptional circumstances such that the error, if left uncorrected, would challenge the fairness, integrity, or public reputation of the judicial process itself." *Brisco v. U.S. Restoration & Remodeling, Inc.*, 10th Dist. No. 18AP-109, 2019-Ohio-5318, ¶ 25. *See State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 40, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997) (stating that "[a]s when they apply criminal plain-error review, reviewing courts applying civil plain-error review 'must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice' "); *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 36. " 'Because parental rights determinations are difficult to make and appellate courts accord wide latitude to the trial court's consideration of evidence in these cases, "[p]lain error is particularly difficult to establish." ' " *Hamilton v. Hamilton*, 10th Dist. No. 14AP-1061, 2016-Ohio-5900, ¶ 8, quoting *Faulks v. Flynn*, 4th Dist. No. 13CA3568, 2014-Ohio-1610, ¶ 20, quoting *Robinette v. Bryant*, 4th Dist. No. 12CA20, 2013-Ohio-2889, ¶ 28.

{¶ 26}  Under this assignment of error, appellant asserts, in essence, that the GAL's testimony should not have been admitted because one, he did not provide testimony regarding the wishes of three of the four children; and two, because he did not observe any visits between one of the children and appellant and offered no explanation for this, and observed only one visit between the other three children and appellant, thereby precluding him from being competent to testify as to their wishes in any event.  Appellant's assertions are disingenuous at best.

{¶ 27} Initially, we note that the record shows that the GAL explained why he was unable to observe any visits between appellant and his youngest child and was able to observe only one visit with the other children. The GAL testified that both appellant and Mother visited with the children sporadically, which made it difficult to schedule a time to observe a visit between appellant, Mother, and the children. Additionally, the GAL testified that appellant's visitation was suspended in March, 2021. The GAL clearly testified that there was never a time during his serving as GAL that either Mother or appellant consistently attended visits with the children. Appellant cannot now be heard to complain about the lack of opportunity for the GAL to observe visits between himself and his children when it is appellant himself who created that lack of opportunity, and the GAL's competence to testify on these matters is not negated thereby.

{¶ 28} Furthermore, in its March 1, 2022 judgment entry, the trial court noted that although the GAL had not had much opportunity to observe visits between the children and the parents due to the parents' sporadic visitation and was unable to testify about the bond between appellant and the children, Brown's testimony provided additional information about visits between appellant and all the children. Thus, the trial court heard evidence regarding observed visits with all the children. The trial court based its decision to grant FCCS' motions for PCC on several factors, and appellant has provided no evidence demonstrating that the trial court's decision was improperly based solely or weighted more heavily on this one aspect of the case.

{¶ 29} As for the GAL's lack of testimony regarding the wishes of three of the four children, he clearly testified that only the oldest child, L.R., was mature enough to understand what permanent custody meant and to express her wishes as to same. Furthermore, Brown testified that she agreed with the foregoing assessment. The GAL testified that he had spoken with L.R. at least four times about the issue, and that she had expressed that she wished to remain with her current foster family. Therefore, the record evinces testimony regarding the oldest child's wishes and that both the GAL and the caseworker believed the three younger children were not mature enough to understand what permanent custody meant and to express their wishes regarding same.

{¶ 30} Moreover, the case cited by appellant in support of his argument on this point actually supports the result in the instant matter. In *In re Lopez*, 166 Ohio App.3d 688,

2006-Ohio-2251, the Third District Court of Appeals reversed the trial court's grant of PCC with respect to the oldest child in that case because the GAL did not provide any testimony or information in the GAL's report indicating what that child's wishes were regarding custody, or whether the child was mature enough to express such wishes. *Lopez* at ¶ 36. The appellate court did not, however, reverse the trial court's decision as it related to the three younger children in the case, who were aged three years old, three years old, and two years old, respectively. *Id.* at ¶ 38. As discussed above, in this case the GAL did provide testimony regarding the oldest child's wishes, and specifically testified that the three youngest children were not mature enough to understand and express their wishes.

{¶ 31} Accordingly, based on the foregoing, the trial court did not plainly err in admitting the GAL's testimony, and appellant's first assignment of error is overruled.

### B. Second Assignment of Error

{¶ 32} In appellant's second assignment of error, he asserts the trial court's decision to grant permanent custody of the children was not in the children's best interest. This assignment of error lacks merit.

{¶ 33} "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio likewise has recognized the essential and basic right of a parent to raise his or her child. *In re Murra*y, 52 Ohio St.3d 155, 157 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28. "Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child." *In re E.B.*, 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 19, citing *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 15, and *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child. *H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000); *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist.1994).

{¶ 34} R.C. 2151.413 permissively allows a public agency to file a motion requesting permanent custody of a child under certain circumstances. When the child has been in the

temporary custody of a public agency for 12 or more months out of a consecutive 22-month period, though, the agency *must* file for permanent custody. R.C. 2151.413(D)(1).

{¶ 35} R.C. 2151.414(B)(1) permits a court to grant permanent custody of a child to a public agency if, after a hearing, it determines "by clear and convincing evidence, that '(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child.' " *In re E.B.* at ¶ 22, quoting *In re K.M.* at ¶ 14. Clear and convincing evidence means evidence that creates a firm belief or conviction as to the facts sought to be established. *In re E.B.* at ¶ 22, citing *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42; *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 14. Thus, "[a] decision to award permanent custody requires the trial court to take a two-step approach." *Id.* at ¶ 18. "First, a trial court must determine if any of the factors set forth in R.C. 2151.414(B)(1) apply." *Id.* Second, the court determines whether granting permanent custody to FCCS is in the best interest of the child. *Id.*

{¶ 36} Relevant to this appeal, R.C. 2151.414(B)(1)(d) provides the following circumstances under which FCCS can move for permanent custody:

> The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *. [4]

{¶ 37} In this case, it is undisputed that the three oldest children were in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. It is further undisputed that the youngest child was in the continuous custody of FCCS for a period of over 12 months, from 60 days after his removal from the home, October 27, 2019, to the date of the filing of the motion for PCC on November 17, 2020. Thus, the statutory factor in R.C. 2151.414(B)(1)(d) was established by clear and convincing evidence.

---

[4] The trial court also found that the factor set forth in R.C. 2151.414(B)(1)(a) (the children could not be placed with either appellant or their Mother within a reasonable time and should not be placed with their parents) was applicable in this case. In any event, appellant does not dispute that the first part of the permanent custody analysis is met under R.C. 2151.414(B)(1)(d) and that FCCS need not provide any additional evidence as to the first part of the permanent custody test.

{¶ 38} Next, in determining the best interest of a child, R.C. 2151.414(D)(1)(a) through (e) sets forth the relevant factors that the court must consider in determining what is in the best interests of the child:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D) does not give any one factor "greater relevance than the others." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 39} In this case, the evidence at trial overwhelmingly supported the trial court's conclusion that granting permanent custody to FCCS was in the children's best interests, and the trial court thoroughly explained its reasoning as it pertained to the four factors relevant in this case in its March 1, 2022 judgment entry. (Mar. 1, 2022 Jgmt. Entry at 23-26.)[5] We discuss each of these factors in turn.

{¶ 40} Under R.C. 2151.414(D)(1)(a), the trial court was required to consider the interactions and relationships between the child and the individuals in the child's life, including the child's parents, siblings, relatives, and "any other person who may significantly affect the child." Here, the trial court found that appellant and Mother had

---

[5] Indeed, the *only* factor which appellant argues was not adequately considered by the trial court was that of R.C. 2151.414(D)(1)(b), which addresses the wishes of the child as expressed by the child or through his or her guardian ad litem.

sporadically visited the children throughout the pendency of the case, and last visited with them on March, 24, 2021. The trial court noted that appellant's and Mother's visits were suspended due to their "constant failure to visit." (Jgmt. Entry at 23.) The trial court considered the testimony of both the GAL and the caseworker concerning the children's lack of bonding with either of their parents, noting that although the oldest child was initially bonded with appellant and Mother, that bond lessened as the visits lessened. Finally, the trial court acknowledged the testimony of the caseworker that during visits the youngest child does not seem bonded to either appellant or Mother, "and in fact he often screams, cries, wants to leave or wants to go to the Caseworker." *Id.*

{¶ 41} In contrast, the trial court found that neither the GAL nor the caseworker had any concerns with the foster home where all four children had been placed. The trial court further observed that both the GAL and the caseworker emphasized "how very bonded the [c]hildren are to their foster parents" and that the children are loving and affectionate with their foster parents and look to them to meet their needs and wants." (Jgmt. Entry at 24.) The trial court also noted the testimony of the caseworker that the children are very bonded to one another and do everything together. The evidence in the form of the testimony from the caseworker and the GAL readily supported all of these findings and supported a conclusion that the children's relationships with their foster family and each other are much stronger than their relationship with appellant. Therefore, the "interaction and relationship" factor weighed in favor of awarding permanent custody to FCCS.

{¶ 42} Next, R.C. 2151.414(D)(1)(b) required the trial court to consider the wishes of the child, expressed either directly by the child or through the child's guardian ad litem. In this case, as discussed above, the GAL testified that while he had spoken to the oldest child L.R. and tried to talk to the three youngest children about what permanent custody means and express their wishes, the oldest child was the only child who was old enough to understand what it means and to express her wishes. As noted previously, the GAL testified he had spoken with L.R. at least four times about her wishes and she expressed to him that she wished to remain with her current foster family. We have already found the GAL's testimony on this factor was competent, credible evidence which the trial court properly admitted. In its judgment entry, the trial court specifically found that only the oldest child L.R. was "of the age and maturity to understand what PCC means and express her wishes."

(Jgmt. Entry at 24.)  The trial court further noted the GAL's testimony that the children are very bonded to the foster parents and recommendation that FCCS' motions for PCC of all the children be granted, and that there was "no conflict between his recommendation and the Children's wishes."  *Id.*

{¶ 43}  Notwithstanding the foregoing, appellant insists that the lack of testimony specifying the wishes of the three youngest children is fatal to the trial court's finding that granting permanent custody of all the children was supported by clear and convincing evidence sufficient to decide the children's best interests.   Appellant's contention is meritless.  The testimony in this case by both the GAL and the caseworker demonstrates that the three youngest children, who were four years old, three years old, and two years old at the time of the hearing, were not mature enough to understand what permanent custody meant and to express their wishes.  We have previously found that where the record affirmatively shows through credible evidence that a child is not capable of communicating his or her wishes, the trial court is excused from considering the child's wishes.  *In re J.W.*, 10th Dist. No. 06AP-864, 2007-Ohio-1419, ¶ 18, citing *In re Wright*, 10th Dist. No. 04AP-435, 2004-Ohio-4045, ¶ 12.  Here, both the GAL's and the caseworker's testimony credibly and affirmatively demonstrated that only the oldest child was mature enough to express her wishes regarding custody and that granting permanent custody was in all the children's best interests.  As noted above, the trial court specifically made this finding in its judgment entry, and we find nothing in the record requiring us to reverse it.  Thus, this factor weighs in favor of the trial court granting permanent custody to FCCS.

{¶ 44}   Next, R.C. 2151.414(D)(1)(c) required the trial court to consider the custodial history of the child.  In this case, it is undisputed, and the trial court found that the oldest child was now seven years old and had not lived with appellant or Mother since he was four years old.  The next oldest child was now four years old and had not lived with appellant or Mother since he was one year old.  The second to youngest child was now three years old and had not lived with appellant or Mother since he was three and one-half months old.  Finally, the youngest child was now two years old and had never lived with either appellant or Mother.  It is also undisputed, and the trial court further determined, that since their removal, all the children have remained placed in their current foster home.  Finally, the trial court found that the children had been in the temporary custody of FCCS for more than

12 months in a consecutive 22-month period. The foregoing findings are supported by the evidence and this factor weighs in favor of awarding permanent custody to FCCS.

{¶ 45} Next, R.C. 2151.414(D)(1)(d) addresses the child's need for legally secure permanent placement and required the court to consider whether this could be achieved without a grant of permanent custody to FCCS. Here, the trial court determined that the children needed a legally secure permanent placement which cannot be achieved without a grant of permanent custody to FCCS. The trial court based its determination on its finding that neither appellant nor Mother had substantially remedied the causes for removal of their children and that no potential relatives were available for placement or custody of the children. The trial court further found that the children were bonded with each other and lived together in the same foster home since either their removal or birth. The trial court also noted the foster parents hoped to adopt all the children, as well as the children's two younger siblings.[6] The foregoing findings are all supported by credible evidence in the record. Therefore, credible evidence in the record supported the trial court's conclusions that appellant was unable to meet the basic needs of the children, that the children need a legally secure permanent placement as required by statute, and such a placement cannot be achieved without a grant of permanent custody to FCCS.

{¶ 46} Finally, under R.C. 2151.414(D)(1)(e), the trial court was required to consider any applicable factors set forth in R.C. 2151.414(E)(7) through (11). The trial court found that none of the factors were applicable in this case, and the evidence in the record supports this finding.

{¶ 47} In sum, the record demonstrates that the trial court properly reviewed and weighed the evidence pertaining to all factors relevant to determining whether granting permanent custody to FCCS was in the children's best interest. Upon our review of all of the evidence presented at trial in this case, we determine that there is competent and credible evidence to support the trial court's conclusion that a permanent commitment is in the children's best interest and in accordance with the law. The trial court's decision is not against the manifest weight of evidence, and appellant's second assignment of error is overruled.

---

[6] The two younger children are not part of this case.

## V. Conclusion

{¶ 48} Accordingly, based on all the foregoing, we overrule both assignments of error presented by appellant L.D.R., and we affirm the decision of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch granting permanent custody of Le.R., Leg.R., L.R. and Lo.R. to FCCS.

*Judgments affirmed.*

DORRIAN and LELAND, JJ., concur.

———————————