[Cite as *In re K.B.*, 2024-Ohio-4463.]

IN THE COURT OF APPEALS OF OHIO

TENNTH APPELLATE DISTRICT

In the Matter of:　　　　　　　　　　：

K.B., et al.,　　　　　　　　　　　　：　　　　Nos. 23AP-392
　　　　　　　　　　　　　　　　　　　　　　　　(C.P.C. No. 19JU-8781)
　　　　　　　　　　　　　　　　　　：　　　　　and
(R.D.,　　　　　　　　　　　　　　　　　　　23AP-393
　　　　　　　　　　　　　　　　　　：　　　　(C.P.C. No. 20JU-000078)
　　　　　　　Appellant).

　　　　　　　　　　　　　　　　　　：　　　　(REGULAR CALENDAR)

---

D E C I S I O N

Rendered on September 10, 2024

---

**On brief:** [*Mitchell A. Williams*], Franklin County Public Defender, and *George M. Schumann*, for appellant R.D.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

**On brief:** *Alana L. Van Gundy*, for appellees Kr.B., Ka.B., and Kea.B.

---

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BEATTY BLUNT, J.

{¶ 1} Appellant, R.D. ("appellant" or "mother") appeals the May 31, 2023 decision and judgment entry from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating the parental rights of appellant and granting permanent court custody ("PCC") of Kr.B., Ka.B., and Kea.B. (collectively, the "children")[1] to Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

---

[1] All of the children's names begin with the letter "K" and therefore additional abbreviations are used herein to differentiate them for clarity.

## I.  Facts and Procedural History

{¶ 2}   On July 31, 2019, FCCS filed a complaint in the Franklin County Court of Common Pleas, Domestic Relations, Juvenile Branch under case No. 19JU-008781, alleging that appellant's children, Kr.B. (d.o.b. 06/14/2016), and Ka.B. (d.o.b. 06/28/2017), were dependent children.  The complaint alleged that appellant previously had custody of two other children, and that appellant also had five other children who had been in the legal custody of the children's paternal grandmother who lived in Knox County.  The complaint further alleged that all seven of these other children were removed from the paternal grandmother's home by Knox County Children Services and were subsequently found dependent.  According to the complaint, Knox County Children Services received PCC of the children in April, 2019.  The complaint further alleged that there was a history of domestic violence between the children's father, K.B. and appellant.

{¶ 3}   On August 8, 2019, the trial court held a preliminary hearing on the complaint and granted FCCS a temporary order of custody ("TOC") of Kr.B. and Ka.B.

{¶ 4}   On September 11, 2019, appellant's attorney requested that the trial court appoint guardian ad litem ("GAL") for appellant based on the fact that appellant was receiving Social Security benefits "for MRDD.[2]"  (Sept. 11, 2019 Tr. at 5.)  The trial court appointed a GAL for appellant.

{¶ 5}   On October 19, 2019, the trial court adjudicated Kr.B. and Ka.B. to be dependent children and granted FCCS a post-adjudication order of temporary court commitment ("TCC").  The trial court approved and adopted the case plan and set an annual review hearing for August 5, 2020.  Ultimately, the TCC orders pertaining to Kr.B. and Ka. B. were extended twice.

{¶ 6}   On January 3, 2020, FCCS filed a second complaint under case No. 20JU-000078, alleging that appellant's child, Kea.B. (d.o.b. 01/02/2020) was a dependent child.  The complaint stated that appellant had given birth to Kea.B. and that Kea.B. was to be discharged from the hospital on January 4, 2020.  The complaint alleged largely the same facts as those in the complaint concerning Kr.B. and Ka.B. but added that FCCS had received TCC of Kr.B. and Ka.B.  The complaint further alleged that appellant had failed to

---

[2] "MRDD" is the acronym for "mental retardation/developmental disability."

maintain housing, was struggling with the previously adopted case plan and had contact with father in contravention of the case plan.

{¶ 7} On January 3, 2020, the trial court granted FCCS an emergency custody order ("ECO") of Kea.B. On January 6, 2020, the ECO was converted to a TOC.

{¶ 8} On March 9, 2020, the trial court adjudicated Kea.B. to be dependent and granted FCCS a post-adjudication order of TCC. The trial court approved and adopted the case plan and set interim and annual review hearings. Ultimately, the TCC order pertaining to Kea.B. was extended once.

{¶ 9} On May 25, 2021, FCCS filed motions for PCC of all three children in both cases. Trial hearings on the pending PCC motions were continued several times.

{¶ 10} On January 24, 2022, the trial court held a pretrial hearing on the pending PCC motions. Appellant was not present for the hearing because she had just given birth to another child, M. At the hearing, FCCS stated it intended to file for emergency custody of M. Additionally at the hearing, the children's GAL requested that counsel be appointed to represent Kr.B. and Ka.B. as the children were expressing some desire to reunify with appellant and the GAL was not yet sure whether he would be recommending reunification or that the PCC motions be granted. The trial court appointed counsel for Kr.B. and Ka.B.

{¶ 11} On August 22, 2022, the children's GAL filed reports recommending the PCC motions be granted. The GAL reported that Kr.B. and Ka.B. no longer wished to reunify with appellant and instead they wished to remain in their respective foster homes.

{¶ 12} On August 29, 2022, both cases proceeded to trial on FCCS' motions for PCC. The trial recessed by agreement on August 31, 2022, resumed on January 23, 2023, and concluded on March 28, 2023. The following evidence relevant to the determination of this appeal was adduced at trial.

{¶ 13} FCCS called K.B., the non-appealing father, as its first witness. K.B. is the father of 10 of appellant's 11 children.[3] He testified his parental rights were terminated as to 7 of his children in Knox County, Ohio.[4] At the time the trial on the PCC motions commenced, K.B. had been living in Cincinnati, Ohio for two years.

---

[3] There was testimony later in the trial that K.B. may, in fact, be the father of all 11 of the children.
[4] The record shows K.B.'s parental rights were terminated in 2019.

{¶ 14} K.B. testified he had been in a relationship with appellant for 17 years, but at the time of the trial they were no longer together. K.B. admitted that there had been domestic violence between appellant and himself. He was convicted of a domestic violence offense against appellant in 2019. As part of his sentence, he completed a domestic violence program in February 2022. K.B. testified that there had been no domestic violence with appellant in the two years prior to the time the trial commenced.

{¶ 15} FCCS called Stefanie Coe, the first parent mentor assigned to the case, as its next witness. Coe was trained as a parent mentor through her employer at the time, Ohio Guidestone, via the nurturing parenting course. The parenting training program provides resources for parent mentors on how to interact with families and parents. Coe was assigned to appellant and her family, and her role was to work "directly one-on-one in-person" with the parents and the children in the parents' care. (Aug. 29, 2022 Tr. at 38.) This included supervising some of appellant's interactions with the children at appellant's apartment. *Id*. at 38-39.

{¶ 16} Coe testified that there was so much clutter and stuff in the apartment that there was a safety hazard risk to the children. Coe stated that although there was a pathway to walk through the apartment, many items were stacked on top of each other in the hallway, which created a risk of things being pulled over by the children. This was a safety issue for Kea.B. in particular due to his age. Coe testified specifically regarding a plastic fuel/gas container sitting by the front door, and that she had discussed with appellant on multiple visits that the gas can should be moved and put away or stored somewhere else. Coe testified she did not believe that appellant was able to identify any immediate safety hazards in the home, including the gas can.

{¶ 17} Coe testified that one of the goals established was to try to help appellant understand that she was the parent and got to make the decisions regarding the children, such as what clothes they wear or what they eat. Coe testified that appellant did not seem to comprehend the difference between rules about what the children were permitted to do or not do versus mere suggestions or advice from others, including the children themselves. Coe testified that they "never made progress on the difference between advice, guidance, someone's opinion versus a rule." (Aug. 29, 2022 Tr. at 62.)

{¶ 18} Coe testified that another goal upon which she was working with appellant was to recognize the safety and developmental needs of the youngest child and in preparation for the new baby, versus the developmental needs of the older children. Coe did not think that appellant was able to identify the different developmental stages of the children and appropriately engage with them while they were doing an activity. Coe further testified that appellant was not interested in working on the subject of, or getting information about, the developmental needs of the children.

{¶ 19} Coe testified that the final goal for appellant was for her to focus on age-appropriate activities for each of the children and balance interaction with each of them with adequate supervision. Despite this, Coe testified that she never observed any developmentally age-appropriate play between appellant and Kea.B. Coe further testified that both she and the children's GAL had more interaction with Kea.B. than appellant did when either Coe or the GAL were at the apartment. Coe further testified that she had specific concerns regarding adequate supervision for Kea.B. She testified that on one occasion he was in a highchair for 45 minutes and that was inappropriate.

{¶ 20} Coe testified that when she had discussions with appellant about the things she was concerned about, she believed that appellant did her best to do something about those things. However, Coe testified that based on her testimony, she did not believe the children could safely return to live with appellant. She clarified that it might be possible for appellant to be able to care for Kr.B. and Ka.B. because they were older and clearly bonded to each other and to appellant, but Coe did not see how appellant could handle multiple children at the same time, especially Kea.B. and the new baby. Coe further opined she did not see a bond between Kea.B. and appellant.

{¶ 21} For its next witness, FCCS called appellant as on cross-examination. At the time the trial commenced, appellant was 34 years old and had been living in a leased apartment on Wedgewood Drive in Columbus, Ohio since March of 2021. Appellant's parents and brothers had been living there at one time but had since moved out. Prior to living in the apartment, she lived in a hotel room with her parents and her brother. Appellant testified she gave birth to Ka.B. in a hotel room. She lived in a hotel room for a year, and prior to that she was staying in a friend's home. The children's father, K.B., did not live with appellant.

**{¶ 22}** Appellant testified that all of her children other than the three children at issue in the instant cases had been "fully adopted out" [i.e., placed in the permanent custody of a public children services agency]. (Aug. 30, 2022 Tr. at 57.) She further testified that the three children at issue in the instant cases had been removed from her care because their father, K.B., had kicked her in the leg. Appellant stated her leg became swollen the next day so she went to Grant Hospital where they advised her to file a domestic violence complaint against K.B. which she did by writing a statement and giving a statement to the police.

**{¶ 23}** Appellant testified she receives "SSI" [Social Security Income] and pays for her own apartment. The apartment is a two-bedroom apartment which are set aside for the children, but she is looking for a three-bedroom apartment. Appellant does not have a driver's license and relies on COTA buses and her dad for transportation. Appellant has not been employed since 2015.

**{¶ 24}** Following the testimony of appellant, FCCS called Chloe Cousin, the FCCS caseworker assigned to the cases. Cousin first became involved with the family in October of 2018 when Ka.B. was a toddler and had choked on something and turned blue. Nationwide Children's Hospital had found there was a lapse in medical care. Appellant agreed to work voluntarily with FCCS as a voluntary case. The concerns resolved and the voluntary case closed about six months later.

**{¶ 25}** Cousin testified that she became involved with the family again in July of 2019 when the dependency complaint regarding Kr.B. and Ka.B. was filed as a result of the domestic violence which occurred between appellant and K.B. FCCS received custody of Kr.B. and Ka.B. on August 9, 2019. On January 3, 2020, Kea.B. came into care as well due to the domestic violence and also because appellant did not have stable housing because the City of Columbus had condemned her housing in November of 2019. After leaving their housing in November 2019, the family moved into a hotel.

**{¶ 26}** Cousin further testified that at the time the trial on the PCC motions commenced, Kr.B. was age six, Ka.B. was age five, and Kea.B. was age two. Kr.B. and Ka.B. were placed in the same foster home, but it disrupted after a couple of months and they were moved to another foster home in October of 2019. Kea.B. was placed in a separate

foster home and has been with his foster parents since February of 2020 when he was about three weeks or a month old.

{¶ 27} In February of 2022, Kr.B. was moved out of her foster home because of her behaviors there and she was placed in the same foster home that Kea.B. was in. Kr.B. and Kea.B. have been together since February of 2022. At the time of the trial, Ka.B. remained placed separately in his foster home since October of 2019. Two of his older siblings[5] also lived there and were in the process of being adopted by the foster parents. The foster parents facilitated visits between Kr.B., Ka.B., and Kea.B., and the three children visited together with appellant and with M.

{¶ 28} Cousin testified that Kr.B. and Kea.B. were very bonded with both their foster parents and with each other. Kr.B. and Kea.B.'s foster home was a potential adoptive placement. Kr.B. and Kea.B. call their foster parents mom and dad. Kr.B. and Kea.B. were also bonded with Ka.B.

{¶ 29} Cousin further testified that Ka.B. was very bonded with his foster parents. He is also bonded to the two older biological sisters in the household who are in the process of being adopted by the foster parents.

{¶ 30} Regarding contact with appellant throughout the case, Cousin testified that appellant had been compliant with the service team and there had never been a lapse in contact with her. Appellant had always maintained contact with Cousin, at least one to three times per month, as required by the case plan. Cousin further testified that appellant never had a lack of effort in taking any case services recommended by FCCS.

{¶ 31} As part of her case plan, appellant was required to maintain stable housing, have stable income, complete parenting classes, complete domestic violence counseling, and complete a psychological evaluation. Cousin testified that in August of 2019, appellant did not have housing. The family, including the children's grandfather and grandmother, had been staying in a hotel for a year. Cousin testified that living in a hotel room was not appropriate for children due to space constraints and there were four adults and a couple dogs living there as well. Subsequently, appellant and the entire family moved out of the hotel room and then lived with a family friend for a couple of months. Cousin then referred

---

[5] These older siblings are not subjects of the within cases.

appellant to Ohio Guidestone for housing assistance and various counseling, and Ohio Guidestone was able to assist appellant in applying for subsidized housing in early 2020.

{¶ 32} Cousin testified that she has visited appellant's apartment where she has lived alone since March 2022. Cousin observed a gas can and crates in the hallway in August of 2022. Mice have been seen in the home during the daytime. Cousin testified that the apartment was not safe due to rodents, cat feces, lots of clutter, and the unsafe location of storage bins. Cousin testified that, at the time of the commencement of the trial, while appellant had housing as required by the case plan, it was unsafe for the children due to the home conditions.

{¶ 33} Subsequent to the commencement of trial, in October of 2022, appellant told Cousin that she was told by the property manager that she could not return to her apartment after an incident involving K.B. and the shooting of a juvenile at the apartment complex. The landlord filed an eviction, so appellant was forced to move out. Thereafter, appellant moved in with K.B.'s brother and his wife. However, appellant would not verify her housing address with Cousin due to appellant's safety concerns and fear of harm related to the October 2022 shooting incident. Appellant's brother also lived at that residence.

{¶ 34} Regarding maintaining stable income as required by the case plan, Cousin testified that appellant's monthly bills "pretty much took a lot of her monthly income not leaving her much to wiggle with." (Aug. 31, 2022 Tr. at 58.) At one point it was of much concern because appellant had several storage units that she was paying on that minimized a lot of her monthly income. K.B. helped with income but he works "under the table" and Cousin had never been provided with any tax documents. *Id.* at 59.

{¶ 35} Cousin testified that appellant completed a psychological evaluation through FORUM in May of 2020. The evaluation found that appellant has an I.Q. of 61. She was also diagnosed with dyslexia. The recommended treatment was to link appellant with a parent mentor for parenting assistance and complete domestic violence counseling. There was a concern that appellant minimized the domestic violence she had experienced, and the caseworker had observed examples of this minimization. Cousin also testified that appellant seemed to lack insight as to how the domestic violence affected the children.

{¶ 36} After the psychological evaluation, appellant met weekly with a counselor through Ohio Guidestone to address the recommended domestic violence counseling.

Appellant also completed a domestic violence seminar through St. Stephen's. She also completed parenting and budgeting and household maintenance programming through St. Stephen's. Cousin testified that although appellant had completed the parenting class portion of the case plan, Cousin still had concerns about appellant's ability to parent. Cousin was specifically concerned about appellant's lack of ability to recognize safety concerns. Cousin testified that unsupervised visits were discontinued because of the lack of proper supervision by appellant and poor home conditions. The home was so cluttered that the children could pull items down and get injured. Appellant's inability to focus on more than one child at a time was also a concern.

{¶ 37} Cousin further testified that FCCS referred appellant to a parenting mentor program and for counseling through Ohio Guidestone and appellant cooperated with both. Appellant was linked with Ohio Guidestone in early 2020 and was assigned a case coordinator and began working with a counselor and parent mentor. Appellant cooperated with the parent mentor program for over a year. Parent mentor services were discontinued because there were so many parenting concerns. Cousin testified that although appellant had taken several parenting classes and had been linked to a parent mentor, Cousin did not see any progression.

{¶ 38} Cousin testified that appellant always visited the children as required by the case plan. Appellant did not miss any visits. Appellant visited with the children, separately from K.B., every week at FCCS for two hours, except when she previously had weekly four-hour visits at her apartment while she was still working with a parent mentor. Cousin testified that appellant was appropriately affectionate towards her children during the visits and the children appeared to be bonded with appellant. However, Cousin further testified that Kr.B. and Ka.B. appeared to be more bonded with appellant than did Kea.B.

{¶ 39} Regarding K.B. and his case plan, Cousin testified that he did not complete the anger management or the domestic violence parts of the case plan. Cousin testified he would take the domestic violence courses and essentially check-mark them "done." (Aug. 31, 2022 Tr. at 84.) But, she did not feel that K.B. internalized the domestic violence courses and that he minimized his behaviors. For example, he denied ever having kicked appellant in the leg.

{¶ 40} Cousin further testified that appellant was not truthful about her contact and relationship with K.B. Appellant was observed to be driven to and from visits at FCCS by K.B. K.B.'s truck was also observed outside or near the location of appellant's home throughout the duration of the case. These observations occurred during the time frame when both appellant and K.B. had informed the service team that K.B. did not know where appellant resided.

{¶ 41} Finally, Cousin testified that she had concerns if the children were to return to either parent. Those concerns included not having any housing; not having sustainable income; and safety concerns of the children being harmed. Cousin was also concerned that appellant has minimized her relationship with K.B. throughout the duration of the case. She also testified that the parenting concerns have not been resolved in regard to the lack of supervision of the children. Cousin testified that the children are in need of a legally secure permanent placement.

{¶ 42} FCCS next called Michael Danchek, the GAL for the children, to testify. Danchek testified that he had met at least once a month with all the children throughout the case. He had visits with the children a total of 56 or 57 times. Danchek was concerned that appellant did not appear to build a separate life from K.B. Danchek had not seen where appellant was currently staying [as of January, 2023] and had not been provided with an address. Danchek testified he had not seen any evidence of stable housing and he does not believe appellant has actually separated from K.B. Danchek was concerned that appellant is unable to recognize that the children have some behavior problems from witnessing past domestic violence.

{¶ 43} Danchek testified that appellant was cooperative with him. Danchek further testified that although appellant tried her best and did a good job managing one child at a time, she had limited ability to supervise multiple small children at the same time. Danchek testified that appellant appropriately cooked meals for the children during the visits at her apartment, and there was always food in the refrigerator.

{¶ 44} Danchek believed that granting the motions for PCC was in the children's best interest and recommended they be granted. He did not believe appellant's parenting skills would improve further. Danchek testified that earlier in the case, Kr.B. and Ka.B. wanted to reunify with appellant, but at the time of the trial on the PCC motions, neither of the

children wanted to reunify. Kr.B. and Ka.B. understood the meaning of adoption. Both seemed to perceive their respective foster homes as their homes, and they have expressed a wish to remain in those homes. Kr.B. even informed Danchek that she is going to be adopted. Danchek testified that the children are bonded with each other. Danchek testified that he did not believe the children should be placed back with appellant.

{¶ 45} FCCS next called Dr. Amanda Conn, a forensic psychologist, to testify. Dr. Conn conducted an assessment of appellant on May 12, 2020. Dr. Conn diagnosed appellant with a mild intellectual disability. Dr. Conn testified that a person with such a disability would have deficits in adaptive skills, judgment, decision making, communication, academics, and daily living skills. Dr. Conn further testified that such a disability could affect a person's ability to parent. Dr. Conn found that appellant had an IQ of 61, which is extremely low, where an average IQ is around 100. Dr. Conn testified that appellant specifically had difficulties with communication.

{¶ 46} Dr. Conn testified that she thought parenting classes appropriate for appellant's cognitive abilities would also help her with daily living skills. Dr. Conn indicated that appellant could have problems generalizing information, in that while she might be able to learn information in a class, she might struggle to apply that information. Dr. Conn testified that appellant would have difficulty multitasking.

{¶ 47} Finally, Dr. Conn testified that appellant did not understand the impact that domestic violence between her and K.B. might have upon the children. Dr. Conn recommended domestic violence classes to help appellant understand the impact of domestic violence on the children and also that appellant should not interact with K.B. Dr. Conn stated that appellant tends to minimize the impact that domestic violence has upon the children in that she may not be motivated to end her relationship with K.B. Appellant admitted to Dr. Conn that she has contact with K.B.

{¶ 48} After FCCS concluded its case-in-chief, appellant presented its witnesses. Appellant called Joyce Sanders to testify as her first witness. Sanders testified she worked for Ohio Guidestone as a case manager for clients with substance abuse and/or mental health issue. Sanders testified she assisted appellant with locating appropriate housing and helped her find her apartment at Wedgewood. She also assisted appellant with getting linked to utilities and with budgeting. Sanders testified that she also acted as a parent

mentor for one visit with the children. Sanders testified that appellant fed the children, engaged in planned activities with them and interacted with the children appropriately.

{¶ 49} Appellant next called Sherry Fleury, appellant's GAL, to testify. Fleury testified she had been part of appellant's case since 2019. Fleury had been to appellant's home approximately five times: three times when the children were present, and two times when the children were not present. Fleury testified she did not have any concerns about appellant's parenting or supervision of the children or the interaction between appellant and the children during the visits at appellant's apartment. Fleury testified that she believed that appellant tried very hard to address the concerns raised by the parent mentor, Stefanie Coe, about the conditions at appellant's apartment. Fleury testified that appellant was very cooperative with herself.

{¶ 50} Fleury further testified that, based on her observations during her visits at appellant's apartment, she believed appellant and the children were very bonded with each other. Fleury believed that appellant had been very compliant throughout the case and had taken advantage of every service that she had been provided. Fleury testified she believed that appellant was capable of parenting her children. Fleury testified that in her opinion, it was in appellant's best interest to be reunified with her children, and it was in appellant's best interest to maintain her parental rights to the children.

{¶ 51} Finally, appellant called Neeraja Locklear to testify. Locklear worked with appellant as a parent mentor during visitations at appellant's apartment from May of 2022 to October of 2022. Appellant was cooperative with Locklear. Locklear testified that during visits, appellant acted appropriately, fed the children, engaged in activities with the children, bonded with the children, and cleaned up the children at the end of the visit. Locklear testified that appellant had surpassed all goals and had completed all parts of the parenting mentor program, which included parenting classes, psychotherapy, and behavioral health treatment.

{¶ 52} Locklear further testified that she believed that appellant was a good parent. Locklear testified that appellant was able to take care of all the children during the visits. Locklear believed that appellant loved the children very much. Locklear testified she never had any safety concerns regarding appellant's apartment itself, but that the apartment complex and neighborhood were not safe.

{¶ 53} Following the trial, on May 31, 2023, the trial court issued a decision and judgment entry sustaining FCCS' motions for permanent custody and divesting the parents of their parental rights. (May 31, 2023 Decision & Jgmt. Entry.) The trial court considered each of the factors in R.C. 2151.414(D) and determined there was clear and convincing evidence that it was in the children's best interest to grant the motion for permanent custody.

{¶ 54} This timely appeal followed.

## II. Assignment of Error

{¶ 55} Appellant assigns the following error for our review:

> The juvenile court's judgment that permanent court commitment of the minor children to Franklin County Children Services was in the minor children's best interests is against the manifest weight of the evidence.

## III. Standard of Review

{¶ 56} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28; *In re B.B.H.*, 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 14. "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8. Accordingly, an appellate court " 'will not overturn a permanent custody order when it is supported by competent, credible evidence.' " *In re M.W.*, 10th Dist. No. 11AP-524, 2011-Ohio-6392, ¶ 20, quoting *In re Siders*, 10th Dist. No. 96APF04-413, 1996 Ohio App. LEXIS 4805 (Oct. 29, 1996), citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992). Further, "[i]n reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *J.T.* at ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

## IV.  Discussion

{¶ 57}  In appellant's sole assignment of error, she asserts the trial court's decision to grant permanent custody of the children was not in the children's best interests and is against the manifest weight of the evidence.  We disagree.

{¶ 58}  "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  The Supreme Court of Ohio likewise has recognized the essential and basic right of a parent to raise his or her child.  *In re Murray*, 52 Ohio St.3d 155, 157 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28.  "Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child." *In re E.B.*, 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 19, citing *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 15, and *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).  In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child.  *H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694, 2000 Ohio App. LEXIS 4550 (Sept. 25, 2000); *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist.1994).

{¶ 59}  R.C. 2151.414(B)(1) permits a court to grant permanent custody of a child to a public agency if, after a hearing, it determines "by clear and convincing evidence, that '(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child.' " *In re E.B.* at ¶ 22, quoting *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 14.  Clear and convincing evidence means evidence that creates a firm belief or conviction as to the facts sought to be established.  *In re E.B.* at ¶ 22, citing *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42; *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.  "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 14.  Thus, "[a] decision to award permanent custody requires the trial court to take a two-step approach." *Id.* at ¶ 18.  "First, a trial court must determine if any of the factors set forth in R.C. 2151.414(B)(1) apply." *Id.*  Second, the court determines whether granting permanent custody to FCCS is in the best interest of the child.  *Id.*

{¶ 60} Relevant to this appeal, R.C. 2151.414(B)(1) provides the following circumstances under which FCCS can move for permanent custody:

> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *. [6]

{¶ 61} In this case, appellant concedes, and thus it is undisputed that the three children Kr.B., Ka.B., and Kea.B. were in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. Thus, the statutory factor in R.C. 2151.414(B)(1)(d) was established by clear and convincing evidence.

{¶ 62} Next, in determining the best interest of a child, R.C. 2151.414(D)(1)(a) through (e) sets forth the relevant factors that the court must consider in determining what is in the best interests of the child:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

---

[6] The trial court also found that the factor set forth in R.C. 2151.414(B)(1)(a) (the children could not be placed with either parent within a reasonable time and should not be placed with their parents) was applicable in this case. In any event, appellant does not dispute that the first part of the permanent custody analysis is met under R.C. 2151.414(B)(1)(d) and that FCCS need not provide any additional evidence as to the first part of the permanent custody test.

R.C. 2151.414(D)(1)(a) through (e).  R.C. 2151.414(D) does not give any one factor "greater relevance than the others."  *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

**{¶ 63}** In this case, the evidence at trial fully supported the trial court's conclusion that granting permanent custody to FCCS was in the children's individual best interest, and the trial court thoroughly explained its reasoning as it pertained to the four factors relevant in this case in its May 31, 2023 judgment entry.  (May 31, 2023 Decision & Jgmt. Entry at 23-26.)  We discuss each of these factors in turn.

**{¶ 64}** Under R.C. 2151.414(D)(1)(a), the trial court was required to consider the interactions and relationships between the child and the individuals in the child's life, including the child's parents, siblings, relatives, and "any other person who may significantly affect the child."  Here, the trial court found that although initially the older children (Kr.B. and Ka.B.) demonstrated a strong bond with both appellant and K.B., those bonds had waned over the duration of the case pendency due to interruptions in visitation. The trial court found in particular that Kr.B.'s bond with appellant had waned, even with regular visits.  The trial court further found that the youngest child, Kea.B., was not bonded with either appellant or K.B.  (Decision & Jgmt. Entry at 24.)

**{¶ 65}** In contrast, the trial court found that all three children currently demonstrated "an extremely strong bond with [t]heir respective foster parents and foster families."  *Id.*  The trial court found that the three children were bonded with each other, and all three were developing a bond with their youngest sibling, M.  The trial court noted that Ka.B. lives with biological siblings who are being adopted by his foster parents.  The trial court also found that Kr.B. and Kea.B. are also bonded to their older siblings who live with Ka.B.  *Id.*

**{¶ 66}** The clear and convincing evidence in the form of the testimony from the parent mentor Stefanie Coe, the caseworker Chloe Cousin, and the children's GAL Michael Danchek readily supported all the foregoing findings. Further, clear and convincing evidence fully supported a conclusion that the children's relationships with their foster family and each other are stronger than their relationship with appellant.  Therefore, the "interaction and relationship" factor weighed in favor of awarding permanent custody to FCCS.

{¶ 67} Next, R.C. 2151.414(D)(1)(b) required the trial court to consider the wishes of the child, expressed either directly by the child or through the child's GAL. In this case, the trial court first found that although Kr.B. and Ka.B. initially wished to reunify with appellant, they are both "now adamant that they want to remain in their [respective] current foster home[s]." (May 31, 2023 Decision & Jgmt. Entry at 25.) The trial court further found that Kea.B. was neither old enough nor mature enough to express his wishes or to understand the nature of the proceedings. *Id.* The GAL's testimony fully supports these findings.

{¶ 68} Moreover, the trial court interviewed Kr.B. and Ka.B. in chambers after the trial testimony had concluded. The trial court noted that Kr.B. was "firm in her opinion" that she wished to remain in her foster home. (Decision & Jgmt. Entry at 25.) The trial court also noted that Ka.B. "without hesitancy reported that he wanted to live with his foster parents." *Id.* Thus, this factor weighs heavily in favor of the trial court granting permanent custody to FCCS.

{¶ 69} Next, R.C. 2151.414(D)(1)(c) required the trial court to consider the custodial history of the child. In this case, it is undisputed, and the trial court previously found, that the children had been in the temporary custody of FCCS for more than 12 months in a consecutive 22-month period. Furthermore, the trial court found that all three children had been in foster care placement for over three years at the time of the court's decision. (Decision & Jgmt. Entry at 25.) The trial court further found that Kea.B. had been living in foster care "his entire life." *Id.* The foregoing findings are supported by the evidence and this factor weighs in favor of awarding permanent custody to FCCS.

{¶ 70} Next, R.C. 2151.414(D)(1)(d) addresses the child's need for legally secure permanent placement and required the court to consider whether this could be achieved without a grant of permanent custody to FCCS. Here, the trial court determined that the children needed a legally secure permanent placement which cannot be achieved without a grant of permanent custody to FCCS. The trial court based its determination on its finding that neither appellant nor K.B. "can provide [the children] with a safe permanent home at the current time or in the reasonably foreseeable future." (Decision & Jgmt. Entry at 25.)

{¶ 71} In this case, the evidence was clear and convincing that although appellant tried her best, the concerns regarding the children's safety and supervision had not been

remedied despite extensive services and assistance provided to appellant. The evidence was also clear and convincing that appellant was not able to maintain stable and secure independent housing. The evidence at trial overwhelmingly demonstrates that appellant continues to struggle with maintaining stable and secure housing for any consistent length of time. The evidence was likewise clear and convincing that even when appellant did have housing, there were problems with the condition of the apartment, including a huge amount of clutter and rodents. The evidence was further clear and convincing that the concerns regarding domestic violence between appellant and K.B. had not been resolved and that appellant tended to minimize the effects of the domestic violence on the children. In short, the trial court's finding that the children should not be returned to appellant (or K.B.) because appellant cannot provide the children with a safe permanent home is supported by credible evidence in the record. Therefore, credible evidence in the record supports the trial court's conclusions that the children should not be returned to appellant's care, that the children need a legally secure permanent placement as required by statute, and such a placement cannot be achieved without a grant of permanent custody to FCCS.

{¶ 72} Finally, under R.C. 2151.414(D)(1)(e), the trial court was required to consider any applicable factors set forth in R.C. 2151.414(E)(7) through (11). The trial court found that both appellant and K.B. have had their parenting rights involuntarily terminated for seven of the children's older siblings, and thus R.C. 2151.414(E)(11) applies. (Decision & Jgmt. Entry at 26.) The evidence in the record supports this finding.

{¶ 73} In sum, the record demonstrates that the trial court properly reviewed and weighed the evidence pertaining to all factors relevant to determining whether granting permanent custody to FCCS was in the children's best interest. Upon our review of all of the evidence presented at trial in this case, we determine that there is competent and credible evidence to support the trial court's conclusion that a permanent commitment is in the children's best interest and in accordance with the law, and the trial court's decision is not against the manifest weight of evidence. Although we share the trial court's empathy for appellant and K.B. and acknowledge that appellant in particular has made efforts to complete her case plan objectives, such considerations may not bear on the issue of whether the motions for PCC were properly granted.

{¶ **74**} Accordingly, based on all the foregoing, we overrule the sole assignment of error presented by appellant, and we affirm the decision of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch granting permanent custody of Kr. B., Ka.B., and Kea.B. to FCCS.

*Judgments affirmed.*

MENTEL, P.J. and JAMISON, J., concur.

———————